793 A.2d 810 (2002)
349 N.J. Super. 381
Kathleen M. O'CONNOR, Plaintiff-Appellant,
v.
William J. O'CONNOR, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued February 21, 2002.
Decided March 27, 2002.
*811 Charles M. DeFuccio, Hackensack, argued the cause for appellant (Rose & DeFuccio, attorneys; Larry J. Esposito, on the brief).
Paul N. Ambrose, Jr., Hackensack, argued the cause for respondent (Schiffman, Berger, Abraham, Kaufman & Ritter, attorneys; Mr. Ambrose, on the brief).
Before Judges BAIME, FALL and AXELRAD.
The opinion of the court was delivered by FALL, J.A.D.
In this post-judgment matrimonial matter, we again address the troubling issue of a parent's application to remove the child of the dissolved marriage to another state as a result of that parent's need to relocate. Justice Long succinctly posed the dilemma as follows:
Ideally, after a divorce, parents cooperate and remain in close proximity to each other to provide access and succor to their children. But that ideal is not always the reality. In our global economy, relocation for employment purposes is common. On a personal level, people remarry and move away. Noncustodial parents may relocate to pursue other interests regardless of the strength of the bond they have developed with their children. Custodial parents may do so only with the consent of the former spouse. Otherwise, a court application is required.
Inevitably, upon objection by a noncustodial parent, there is a clash between the custodial parent's interest in *812 self-determination and the noncustodial parent's interest in the companionship of the child. There is rarely an easy answer or even an entirely satisfactory one when a noncustodial parent objects. If the removal is denied, the custodial parent may be embittered by the assault on his or her autonomy. If it is granted, the noncustodial parent may live with the abiding belief that his or her connection to the child has been lost forever.
[Baures v. Lewis, 167 N.J. 91, 96-97, 770 A.2d 214 (2001).]
When relocation of one parent is certain, the ultimate dilemma facing the court is the vexatious reality that there is no result that satisfactorily meets the needs of the parties or the child. In circumstances where the parent has a healthy, meaningful relationship and bond with the child, there are few circumstances where the judicial determination will not adversely affect the parties and the child. If removal is granted, the nature of the relationship and bond between the parent left behind and the child changes and is at risk. The same result occurs as to the relationship and bond between the relocated parent and the child if removal is denied. Additionally, removal actions often create, or fortify, walls of animosity between the parents, furthering the negative impact to all concerned. The result is hard and predetermined; no one wants it, yet the consequences are inevitable. It is against this dreary context that we consider this appeal.
Plaintiff, Kathleen M. O'Connor, appeals from an order entered on September 25, 2001, after a plenary hearing, denying her application to remove and relocate the parties' child to the State of Indiana and designating defendant, William J. O'Connor, as the child's primary residential custodian.
We hold that in determining the standard to be applied to a parent's removal application, the focus of the inquiry is whether the physical custodial relationship among the parents is one in which one parent is the "primary caretaker" and the other parent is the "secondary caretaker." If so, the removal application must be analyzed in accordance with the criteria outlined in Baures, supra, 167 N.J. at 116-17, 770 A.2d 214.
If, however, the parents truly share both legal and physical custody, an application by one parent to relocate and remove the residence of the child to an out-of-state location must be analyzed as an application for a change of custody, where the party seeking the change in the joint custodial relationship must demonstrate that the best interests of the child would be better served by residential custody being primarily vested with the relocating parent.
In determining whether the parties truly share joint physical custody, although the division of the child's time with each parent is a critical factor, the time each parent spends with the child must be analyzed in the context of each parent's responsibility for the custodial functions and duties normally reposed in a primary caretaker.
Here, we conclude the findings and conclusions of the trial court that the parties truly share jointly both legal and physical custody of their child is supported by substantial, credible evidence in the record. We affirm the court's rejection of plaintiff's application for removal.
The journey of the parties to this point began with their marriage on September 8, 1989. Ryan William O'Connor was born of their marriage on October 16, 1991.
The parties encountered marital problems and separated in February 1993, *813 which led to the filing of a divorce action. On November 15, 1994, the parties appeared in the Family Part and their counsel placed an oral agreement between them on the record, to which they assented, and the marriage was dissolved.
Subsequently, on March 7, 1995, the parties entered into a written property settlement agreement memorializing the terms of their oral agreement. The written agreement provided, inter alia, that the parties shall have joint custody of Ryan, with plaintiff having residential custody subject to the reasonable and liberal parenting time of defendant as mutually agreed upon by the parties. This common resolution vested the legal custody of Ryan jointly with both parties on issues pertaining to the health, education and welfare of the child, and vested primary physical custody of Ryan with plaintiff. See Pascale v. Pascale, 140 N.J. 583, 595-97, 660 A.2d 485 (1995); Beck v. Beck, 86 N.J. 480, 486, 432 A.2d 63 (1981).
On March 23, 1995, a form of final judgment of divorce was executed, incorporating the terms of the property settlement agreement. Subsequent to the divorce, both parties continued to reside in Bergen County in relatively close proximity; plaintiff resided in Mahwah with Ryan and defendant in Hawthorne.
The facts found by the trial court after the plenary hearing were, as follows. At the time of Ryan's birth, plaintiff worked for Kids R Us as a buyer; she returned to work approximately eight months after Ryan's birth. Defendant worked for Verizon in the installation and repair division.
After their separation, defendant began visiting with Ryan at least once each week. Shortly thereafter, defendant began parenting-time sessions with Ryan each week on Saturday overnight to Sunday.
The role of defendant in Ryan's everyday life began to change as plaintiff's employment responsibilities changed. Plaintiff became employed with Aquarius, Ltd., an accessory company, on September 27, 1993 as an assistant senior buyer, with a substantial increase in salary. Aquarius had its parent offices in St. Louis, Missouri, and also had an office in Manhattan, from which plaintiff worked.
After the parties separated, plaintiff hired a nanny who, with the assistance of plaintiff's mother, cared for Ryan. Ryan attended a pre-school facility part time at first, then full time. Defendant began to pick up Ryan from pre-school on days when plaintiff was unable to do so.
When Ryan began kindergarten, he went to school for a half day and then was bused to the YMCA, where he stayed until mid-afternoon, when a sitter hired by plaintiff picked Ryan up and brought him to plaintiff's residence. Beginning in the first grade, Ryan was brought to a before-school care program, and then to an after-school care program three days each week until 6:00 p.m., when he was picked up by plaintiff. The other two days, defendant picked Ryan up from the after-school care program at approximately 4:30 p.m. During school vacations, Ryan either attended the YMCA program or plaintiff took off from work and cared for him. When Ryan was sick, plaintiff would either take off from work or plaintiff's mother would care for Ryan.
In 1995, plaintiff was promoted as the head of designer merchandising and was required to travel internationally, mostly to Asian countries, at least twice each year. During most of those trips defendant and plaintiff's mother would share the caring responsibilities for Ryan.
In January 1996, defendant's job duties changed to that of a construction splicer, and his work hours were changed to 7:00 *814 a.m. to 3:00 p.m., enabling him to expand his parental role in Ryan's life.
In January 1999, plaintiff's mother moved to California and was no longer able to care for Ryan. At or about that time, the nature of plaintiff's job changed such that she stopped traveling internationally, but was required to travel more domestically. Beginning in January 1999, when plaintiff was not traveling, defendant picked up Ryan from school two or three days each week and kept Ryan with him until approximately 7:30 or 8:00 p.m., when he returned Ryan to plaintiff's home. When plaintiff was traveling, Ryan would stay overnight with defendant. Defendant would pick up Ryan from school, help him with his homework, take Ryan to his sporting events and feed him dinner. When asked, defendant would change his morning work hours so that he could take Ryan to school in the morning.
The evidence at the plenary hearing disclosed that during the 911 days from January 1, 1999 up until commencement of the plenary hearing in 2001, plaintiff traveled 278 of those days, during which defendant solely cared for Ryan. The parties also divided the responsibility for driving Ryan to and from his school on an approximately equal basis. In 1999, defendant picked up Ryan from school 125 times, plaintiff doing so 46 times; in 2000, defendant picked up Ryan from school 123 times, with plaintiff doing so 60 times. In 2001, up until the time of plaintiff's move to Indiana, defendant did so 68 times, with plaintiff picking up Ryan from school on 35 occasions. On the other hand, plaintiff dropped off Ryan at school on significantly more occasions than did defendant during 1999, 2000, and 2001.
The records produced by defendant at the hearing demonstrated that during 1999, up until plaintiff's move to Indiana in June 2001, defendant had Ryan with him for 176 weekend days and 134 weekend-day overnights, whereas plaintiff had Ryan with her on 68 weekend days and 105 weekend-day overnights. During 1999, up until plaintiff's move to Indiana in June 2001, defendant had Ryan with him overnight on 298 non-weekend days and plaintiff had Ryan overnight with her on 533 non-weekend days overnight.
The evidence established that the parties shared the custodial responsibilities and duties in meeting Ryan's needs; both parties purchased clothing for Ryan; plaintiff primarily attended to Ryan's religious instruction and his medical appointments and care, although defendant participated; defendant took Ryan to sign-up for his various sporting activities such as baseball, basketball and soccer, and attended almost all of Ryan's practices and games; plaintiff attended all of Ryan's baseball games unless she was traveling; defendant attended all Ryan's events at school, such as concerts or plays. The parties also shared the responsibility for attending parent-teacher conferences, and defendant attended all of the back-to-school nights. Defendant went on a school field trip with Ryan to the Museum of Natural History. Defendant also signed most of Ryan's report cards.
The evidence also demonstrated that Ryan had a close relationship with his extended family members. Ryan saw his paternal grandparents at least once each week and the grandparents sometimes attended Ryan's sporting events. Ryan considered his twin paternal male cousins "like brothers" and saw them at least once or twice each week, and they attended each other's sporting events. Ryan also had two close friends in Mahwah.
In February 2000, plaintiff began a relationship with Christopher Love, who lived in Indianapolis, Indiana. Mr. Love works as a commercial salesman in his family's *815 heating and cooling business in Indianapolis. Mr. Love owns thirteen percent of the business and was being groomed to take over its operation.
Plaintiff and Mr. Love became engaged in February 2001 and planned to marry in June 2002. By 2001, plaintiff had attained the position of a national sales manager and her employer agreed to allow plaintiff to retain her position and work in their Indianapolis office.
On February 19, 2001, plaintiff and Mr. Love executed a contract for the purchase of a home in Indianapolis. Closing of title took place on March 30, 2001. Plaintiff was unaware that she needed the permission of defendant, or the court, to remove Ryan from New Jersey to take up residency in Indiana. Plaintiff intended to relocate to Indiana with Ryan at the end of June 2001.
When defendant learned of the planned move he objected. Both parties retained counsel and attempted to reach an agreement. However, while plaintiff focused on a parenting-time schedule for defendant that would provide him significant time with Ryan, defendant maintained he wanted to assume residential custody of Ryan in New Jersey and was willing to move from Hawthorne to Mahwah to allow Ryan to attend the same school system and maintain continuity in the Mahwah community.
On June 18, 2001, on defendant's application, the trial court entered an order restraining plaintiff from removing Ryan from New Jersey and designating defendant as Ryan's primary residential custodial parent. Plaintiff was ordered to show cause on June 22, 2001, why the court should not continue the restraints, place residential custody with defendant, set a parenting-time schedule for plaintiff, and schedule a plenary hearing. On June 22, 2001, plaintiff filed an application seeking permission to remove Ryan to reside with her in Indiana, and for permission to enroll Ryan in the fourth grade in Indiana pending the outcome of the plenary hearing.
On July 17, 2001, the court entered an order directing that a plenary hearing be conducted on August 13, 2001 on the issues of "[t]he relocation and custody of the parties' minor child." A separate order of that same date was executed, permitting Ryan to visit plaintiff's mother in California. The parties also agreed to jointly retain Dr. Judith Brown Greif, a psychologist, to perform a forensic psychological evaluation concerning the relocation and custody issues.
Dr. Greif performed the evaluation and issued a report dated August 7, 2001. In her report, Dr. Greif stated she "lean[ed] in the direction of recommending that [plaintiff] be named Ryan's primary residential parent during the school year, and that [defendant] assume that role during the summer[,]" which would allow Ryan "to relocate to Indiana with his mother and attend school there."
The scheduled August 13, 2001 plenary hearing was adjourned and rescheduled to commence shortly after Labor Day. The adjournment prompted plaintiff to make an emergent application to the Family Part seeking permission to relocate Ryan to Indiana and to enroll him in school there pending the outcome of the plenary hearing. The school year in Indiana commenced August 15, 2001; the school year in New Jersey commenced September 5, 2001. Counsel for the parties affixed their consent to an order permitting the temporary removal. Thereafter, counsel were advised by the court that the plenary hearing would not commence until later in September 2001. On August 31, 2001, defendant sought an order to show cause to *816 prevent the temporary relocation; the application was denied.
A plenary hearing was conducted before Judge Robert C. Wilson on five days between September 6, 2001 and September 17, 2001. At the conclusion of the hearing, Judge Wilson rendered an oral opinion determining that the parties had a shared-parenting joint custodial arrangement of equal time with Ryan, denied plaintiff's application for removal, and vested residential custody of Ryan with defendant. An order memorializing that decision was executed on September 25, 2001. In considering the evidence presented and rendering his decision the judge stated, in pertinent part:
Dr. Greif did interview the child Ryan, and quoted Tale of Two Cities by Dickens, saying that in some ways, or paraphrased it, that this in some ways was the best of relationships and the worst of relationships. Specifically, that there was shared parenting, that Ryan perceived it as 50/50, that she-in her opinion sees it as 50/50, and that by relocating the mother would be changing that situation, and that there certainly would be a change for Ryan.
That Ryan indicated that he had the best of all possible lives, the parties had gotten along really well, that he felt his relationship was 50/50 and he had a great life until he heard the word move and then everything changed. That he didn't necessarily endorse the move, and how this was a substantial change in Ryan's life. That the plaintiff in some ways never took into account what had happened. That she had fostered the relationship with the defendant, the father, and that a 50/50 percent relationship or a joint shared parenting relationship developed, which was the good news about the separation of these parties, but then when she decided to relocate she didn't quite understand why the defendant would now have a problem, why he would suddenly [not] just go along with it.
That the plaintiff did not account for the attachment that developed. And on the other hand, it certainly was Dr. Greif's opinion that anything could happen. Mr. Love could relocate here and that would be a wonderful thing, but in the end [plaintiff] could be named to have custody and that [defendant] could have the child in the summer so that would allow the mother to relocate to Indiana, and then that relationship would work, that Ryan basically could handle either one of these things.
And so, therefore, we come to a statement of ... the law in this state, and the law in the state has been now made clearer by the decision of [Baures v. Lewis, supra ] in some ways, and some ways maybe harder.
....
The Court in Baures ... goes on to carefully state that one final and important point is that the Cooper-Holder scheme, which was the previous way that the Courts had been deciding removal cases, is entirely inapplicable to a case in which the non-custodial parent shares physical custody, either de facto or de jure, or exercises the bulk of custodial responsibilities due to the incapacity of the custodial parent or by formal or informal agreement. In [those] circumstances the removal application effectively constitutes a motion for a change in custody, and will be governed initially by a changed circumstances inquiry and ultimately by a simple best interest analysis.
Obviously then, the preliminary question in any case in which a parent seeks to relocate with a child is whether it is a removal case or whether, by virtue of *817 the arrangement between the parties, it is actually a move for a change of custody.
....
Under the unique facts of the instant case where both legal and physical custody is truly shared, the Cooper-Holder analysis with its concomitant burden on the parent resisting the move out of state to come forward with evidence, that a proposed ultimate visitation schedule would be impossible or unreasonably burdensome is inappropriate. While much of the reasoning of those cases applies, the placing of a burden of proof on the parent [resisting] the move would be unfair, given the totally shared parenting arrangement that has, to date, been engaged successfully by the parties herein.
So, the Court in Baures effectively acknowledged that a true shared parenting arrangement would be an exception to the scheme in Baures.

....
The child did acknowledge that he did make the comment concerning a perfect life when he lived here in New Jersey, he acknowledged that he is now in Indiana, but by his answers indicated that he expected to be coming back to New Jersey, and that's what he preferred to do.
He did not know what was going on in this courtroom, and he loved both parents immensely. He did acknowledge a special relationship with his father concerning sports and doing homework with his father and schooling, and that he had a shared parenting relationship.
....
The Court does find that there was a shared parenting relationship, that the matter did change. The Court, when this matter was placed emergently before it, knowing the Baures decision ... did permit the plaintiff to bring the child to start schooling in Indiana and to start there, but yet all parties agreed that the Court would continue to exercise jurisdiction, and that if the ... move was not going to be permitted, that the child would come back to New Jersey, the home state.
....
We did note that there is a good faith reason for the move....
There is no need for the plaintiff to relocate for business purposes or for her job[.] ...
And with regard to the second test, that the move will not be [inimical] to the child's interest, certainly there's nothing harmful. The child would survive in either case, whether in Indiana or in New Jersey, but the Court was convinced by the evidence adduced by the defendant that there was, in fact, a change, that there is shared parenting, that everybody acknowledges ... there was shared parenting, and that the time, whether it's overnight, et cetera, is effectively 50/50 by these parties.
That the defendant kept accurate records, has made his list and checked it twice, and has effectively proved to this Court that there was a shared parenting relationship, ... that the agreement that was originally executed at the time of the divorce certainly had changed. That the child has acknowledged that everything is 50/50.
The Court finds that it is 50/50 and the Court finds that there's a shared parenting relationship.
....
It almost becomes, therefore, what is in the best interest of the child and what can come out here.
Certainly, the reasons for the move to [cohabit] with the fiancé seem to be *818 made in good faith, ... but the reasons for the opposition are also substantial.... [T]his is the child's home state, it is his home. He acknowledges it is his home.
This is where his friends are, where his cousins are. He's acknowledged to the Court that this is where his grandmother and grandfather [are] and where his cousins are. That he has spent considerable quality time with his father, that it is 50 percent, that it is meaningful time, ... he did acknowledge to the Court that the father only missed one of his sporting events and that the father worked with him.
He did also acknowledge that there's a relationship with his mother, and certainly the Court made it clear that I wasn't going to make him choose and I didn't even want him to voice that, because that certainly would be cruel....
The past history or dealings between the parties as bears on the reason for and against the move. Actually, the dealings had always been agreeable and cooperative. I think all the parties acknowledge that. That they had no need of Courts or attorneys up until this case of removal occurred. That there [were] no disputes on support, et cetera.
....
Thatwith regard to comparable educational health and leisure opportunities, the Court finds there's no difference....
The child has no ... special needs or talents, as was in Baures. He's a very normal well adjusted good student, a wonderful young man, and therefore, can take advantage of any opportunities.
Whether a visitation and communication schedule can be developed that will allow the non-custodial parent to maintain a full continuous relationship with the child, well, I don't find there's a non-custodial person here. I find that there's a shared parenting. That the father would be willing to maintain that relationship, and that the mother certainly could maintain the relationship. That even if the child comes to New Jersey that she has flexibility in her work schedule, that she can come to New Jersey. She can maintain relationships through the Internet, et cetera, with the child if he is housed in New Jersey, and that she can still maintain her relationship with Mr. Love. That Mr. Love could relocate. I'm not even going to force him to do that, but certainly, she has that flexibility.
The likelihood that the custodial parent will continue to foster the relationship of the child with the non-custodial parent, I have some serious problems whether I think the plaintiff can do that if she moves to Indianapolis.
The mother, again, as Dr. Greif pointed out and as the Court, by assessing the demeanor and credibility of the witnesses, I don't believe she appreciates the role of this father at all. She developed a relationship to this father, and then as Dr. Greif said, then ... couldn't understand why when she wanted to ... move off to Indianapolis with the child that the father would have a problem, and I find that the visitation plan that she's promulgated was really just an afterthought to satisfy case law....
....
[T]hat there is going to be an adverse effect on the extended family relationships. Not with plaintiff's family. She has no family in Indianapolis or Indiana or the Midwest at all that we heard of... but that there is a substantial relationship with the ... relati[ves] in New Jersey. That Ryan, when he spoke to the Court, indicated his substantial relationship with his cousins and his grandparents, *819 and how valuable they were to him.
....
[H]is preference is to stay in New Jersey. His preference was stated that way to Dr. Greif, he had the best of all possible worlds....
....
[Defendant has] worked 20 years for the same company, and he has worked out an arrangement ... in effect to have substantial parenting time with his child. However, the mother can [live] anywhere she wants to. She doesn't have to relocate to Indianapolis. She has the ability to be wherever she wants to be. Apparently, ... she can work and tele-commute, and that she, in fact, has an office in New Jersey.
....
Mother can easily travel back and forth in this modern air transportation age at this point. She's a world traveler and a ... national traveler. But the child does not like airplanes. He told me that, it's also echoed in Dr. Greif's report. He doesn't want to be going back and forth on airplanes.
The mother's arrangement that the father is going to live in her house to stay out there seems somewhat farfetched, to say the least. How comfortable the father would be living in someone else's house, especially his ex-wife's house and her fiancé's strains credibility. But the mother, in fact, could maintain two residences if she so wishes.
She has an economic ability to do that. She can travel back and forth and she could maintain residence here in New Jersey if she so wished.
She testified to her high economic status, and certainly adjustments could be made to do that[.]
....
If we looked at the criteria now not using the Baures criteria, because this is a shared parenting relationship, a de facto shared parenting relationship, we would look at N.J.S.A. 9:2-4c, and frankly, we could skip most of the first few factors, [be]cause the parents' ability to agree and communicate, cooperate ... in matters relating to the child have already been discussed, and I think they both are willing to have the other party involved in their matter[.] ...
....
I believe ... and I'll find, frankly, that the plaintiff was not only blind to the defendant's attachment to Ryan, but I think she was blind to what Ryan really preferred. She was blind because she was in love, but that doesn't mean that Ryan doesn't have the preference, and that he is of sufficient age and reason to know and form an intelligent opinion, and that is, that he wants to be with his dad and he wants to be with his mom, and he wants to be in the State of New Jersey and that it fits his needs, and his emotional needs.
So, his father's been supporting him emotionally and educationally. His father may not be making the same kind of money, but he is, in fact, the caregiver that the child is looking to, and that the father has a stable home environment that he's offering.
The father has not a scattered relationship history. He's lived in the same place for the same time doing the same thing with the ... same child. He does offer a stable home environment for that child, and that's what the child is seeking, and that the extent and quality of the time spent with the child prior to and subsequent to the separation, or in this case prior to ... and since the decision to relocate, the father has spent *820 quality time with this child and sufficient time....
The parents' ... employment responsibility. The father's employment responsibilities keep him in the State of New Jersey and only in the State of New Jersey and he doesn't have to leave....
The plaintiff, to her credit, has been able to advance her career and do very well[.]
So, the Court is going to require that the child stay in the State of New Jersey with his father, but is going to require the father to enroll the child in the Mahwah School District immediately and will pay for that if he doesn't relocate, if there's a charge, because he is not in Mahwah right now, but I'll accept his word that he's going to do so, and he'll pay for any kind of tuition for that.
....
The Court also hopes that the parties can communicate again, that the visitation schedule be taken to contemplation, the time off, so that the mother will have as much time as possible when this child is not in school. Just as the mother had stated she would give to the defendant, the defendant will be expected to give to the plaintiff.
The trial court also denied plaintiff's application for a stay of its decision.
On appeal, plaintiff presents the following arguments for our consideration:
POINT I
THE DECISION IN BAURES v. LEWIS, 167 N.J. 91, 770 A.2d 214 (2001) DID NOT ARTICULATE THE SPECIFIC FACTORS A TRIAL COURT MUST CONSIDER IN DETERMINING WHETHER A DE FACTO JOINT CUSTODY ARRANGEMENT EXISTS. AS SUCH, A CLARIFICATION OF THE FACTORS WHICH MUST BE CONSIDERED BY A TRIAL COURT IS NECESSARY TO ENABLE THE TRIAL COURT TO RECONSIDER THE ISSUE ON REMAND.
POINT II
IN THE ABSENCE OF SPECIFIC STANDARDS TO ENABLE THE TRIAL COURT TO DETERMINE WHETHER THE PARTIES HAD A DE FACTO SHARED PARENTING ARRANGEMENT, THE TRIAL COURT SHOULD HAVE RELIED ON EXISTING CASELAW RELATING TO JOINT CUSTODY TO DETERMINE WHO WAS THE PRIMARY CARETAKER. THE TRIAL COURT'S FINDING THAT DEFENDANT WAS A DE FACTO JOINT CUSTODIAL PARENT WITHOUT ANALYZING WHICH PARENT WAS THE PRIMARY CARETAKER CONSTITUTED AN ABUSE OF DISCRETION.
POINT III
THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY FAILING TO TREAT THIS MATTER AS A REMOVAL CASE AND APPLY THE STANDARDS ARTICULATED IN BAURES v. LEWIS. HAD THE TRIAL COURT CORRECTLY APPLIED THE BAURES STANDARDS, THE PLAINTIFF SHOULD HAVE BEEN ALLOWED TO RELOCATE WITH THE PARTIES' SON.
The common thread in all these arguments is plaintiff's contention that the trial court improperly analyzed this case as a change in custody matter rather than a removal application.
In a removal application, the party seeking the relocation has the initial burden to "produce evidence to establish prima facie that (1) there is a good faith reason for the move and (2) that the move *821 will not be inimical to the child's interest. Included within that prima facie case should be a visitation proposal. By prima facie is meant evidence that, if unrebutted, would sustain a judgment in the proponent's favor." Baures, supra, 167 N.J. at 118, 770 A.2d 214. Once the proponent of the removal application establishes a prima facie case, "the burden devolves upon the noncustodial parent who must produce evidence opposing the move as either not in good faith or inimical to the child's interest." Id. at 119, 770 A.2d 214. The Court held that in assessing whether to permit removal, the court
should look to the following factors relevant to the plaintiff's burden of proving good faith and that the move will not be inimical to the child's interest: (1) the reasons given for the move; (2) the reasons given for the opposition; (3) the past history of dealings between the parties insofar as it bears on the reasons advanced by both parties for supporting and opposing the move; (4) whether the child will receive educational, health and leisure opportunities at least equal to what is available here; (5) any special needs or talents of the child that require accommodation and whether such accommodation or its equivalent is available in the new location; (6) whether a visitation and communication schedule can be developed that will allow the noncustodial parent to maintain a full and continuous relationship with the child; (7) the likelihood that the custodial parent will continue to foster the child's relationship with the noncustodial parent if the move is allowed; (8) the effect of the move on extended family relationships here and in the new location; (9) if the child is of age, his or her preference; (10) whether the child is entering his or her senior year in high school at which point he or she should generally not be moved until graduation without his or her consent; (11) whether the noncustodial parent has the ability to relocate; (12) any other factor bearing on the child's interest.
[167 N.J. at 116-17, 770 A.2d 214.]
However, the Court made it clear that the removal analysis
is entirely inapplicable to a case in which the noncustodial parent shares physical custody either de facto or de jure or exercises the bulk of custodial responsibilities due to the incapacity of the custodial parent or by formal or informal agreement. In those circumstances, the removal application effectively constitutes a motion for a change in custody and will be governed initially by a changed circumstances inquiry and ultimately by a simple best interests analysis.... Obviously then, the preliminary question in any case in which a parent seeks to relocate with a child is whether it is a removal case or whether by virtue of the arrangement between the parties, it is actually a motion for a change of custody.

[Id. at 116, 770 A.2d 214.]
See Voit v. Voit, 317 N.J.Super. 103, 119, 721 A.2d 317 (Ch.Div.1998) (holding that the removal criteria is inapplicable where both legal and physical custody is shared because there in no inequality between the parents' contributions to the child's best interest); see also Chen v. Heller, 334 N.J.Super. 361, 380-82, 759 A.2d 873 (App.Div.2000) (expressly approving the approach adopted in Voit).
Accordingly, the initial inquiry centers on the nature of the custodial relationship between the parents and the child. Where the parents truly share both legal and physical custody, an application by one parent to relocate with the child to an out-of-state location is analyzed as an application for a change of custody. Under such *822 circumstances, the party seeking the change in the custodial relationship must demonstrate that the best interests of the child would be better served by residential custody being vested primarily with the relocating parent. Chen, supra, 334 N.J.Super. at 380, 759 A.2d 873; Voit, supra, 317 N.J.Super. at 112, 721 A.2d 317. Where the relocating parent is the "custodial parent" or "primary caretaker" in relation to the physical custody of the child, the removal application is analyzed in accordance with the criteria outlined in Baures, supra, 167 N.J. at 116-17, 770 A.2d 214.
Our Supreme Court explained the custodial relationship and "primary caretaker" concept, as follows:
In cases of only joint legal custody, the roles that both parents play in their children's lives differ depending on their custodial functions. In common parlance, a parent who does not have physical custody over her child is the "non-custodial parent" and the one with sole residential or physical custody is the "custodial parent." Because those terms fail to describe custodial functions accurately, we adopt today the term "primary caretaker" to refer to the "custodial parent" and the term "secondary caretaker" to refer to the "non-custodial parent."

[Pascale, supra, 140 N.J. at 598, 660 A.2d 485.]
The focus here is not on "joint legal custody." The parties clearly share joint legal custody. In determining the applicable standard to apply to plaintiff's removal application, the primary inquiry is whether the physical custodial relationship between plaintiff and defendant is one where plaintiff is the "primary caretaker" and defendant is the "secondary caretaker," or, whether these parties truly share both legal and physical custody.
In discussing the criteria or factors to be used in determining that question, the Court stated:
Although both [primary caretaker and secondary caretaker] roles create responsibility over children of divorce, the primary caretaker has the greater physical and emotional role. Because the role of "primary caretaker" can be filled by men or women, the concept has gained widespread acceptance in custody determinations. Indeed, many state courts often determine custody based on the concept of "primary caretaker."
In one of the earliest cases using the concept of "primary caretaker," the Supreme Court of Appeals of West Virginia articulated the many tasks that make one parent the primary, rather than secondary, caretaker: preparing and planning of meals; bathing, grooming, and dressing; purchasing, cleaning and caring for clothes; medical care, including nursing and general trips to physicians; arranging for social interaction among peers; arranging alternative care, i.e., babysitting or daycare; putting child to bed at night, attending to child in the middle of the night, and waking child in the morning; disciplining; and educating the child in a religious or cultural manner. [Garska v. McCoy, 167 W.Va. 59, 69-70, 278 S.E.2d 357, 363 (1981) ] As do many other jurisdictions, we find that that State's highest court's definition articulates many of the duties of a primary caretaker.
[Pascale, supra, 140 N.J. at 598-99, 660 A.2d 485 (other citations omitted).]
We recently considered the analysis of the custodial relationship in the context of a removal application in Mamolen v. Mamolen, 346 N.J.Super. 493, 788 A.2d 795 (App.Div.2002), where we noted:

*823 In recognizing that the Cooper/Holder analysis is inapplicable to a true shared custodial relationship, in Baures our Supreme Court expressly stated its agreement with Voit v. Voit, 317 N.J.Super. 103, 721 A.2d 317 (Ch.Div.1998), where the parties' parenting relationship negated the relevance of the "sincere, good faith reasons" of the parent seeking removal and permission to remove turned on the "best interests" of the children. 167 N.J. at 114-15, 770 A.2d 214.

[Id., at 496, 788 A.2d 795.]
Although we concluded in Mamolen that the findings of the trial court did not support the ultimate determination that a joint physical custodial relationship existed, we considered the appropriate approach in making such an analysis, as follows:
We initially state our agreement with the trial judge that defining the true essence of a custodial relationship does not turn on the labels utilized by the parties. It has long been de rigueur for divorcing parents to recite in their separation agreements that they will share "joint custody" of their children. Such was the case here. However, such labels do not provide conclusive proof of the relationship's inherent nature. Our family courts are courts of equity and are bound not by the form of agreements, only substance.... In short, while the terms of the parties' separation agreement may be probative of their intentions, a court of equity is not only freed from but obligated to determine the true nature of the relationship regardless of labels and artificial descriptions.
....
Accordingly, while a court may look past labels and imprecise language utilized to describe a custodial arrangement, the element of time is of critical importance in determining the presence of joint physical custody.

[Id., at 498-99, 788 A.2d 795 (citations omitted).]
Although "time" is a critical factor to consider in determining the presence of a joint physical custodial relationship, we emphasize the importance of analyzing the division of time in the context of each party's responsibility for the custodial functions, responsibilities and duties normally reposed in the primary caretaker, such as those outlined above in Pascale, supra, 140 N.J. at 598-99, 660 A.2d 485.
As we noted in Mamolen, supra, joint physical custodial relationships, such as present in Voit, are rare. 346 N.J.Super. at 499, 788 A.2d 795; see also Pascale, supra, 140 N.J. at 597, 660 A.2d 485.
Here, the trial judge made specific and detailed findings concerning the custodial relationship between plaintiff and defendant that centered not only upon the division of the child's time with each parent, but also on the division of key custodial responsibilities, such as bringing the child to and picking the child up from school; helping the child with his homework assignments; bringing the child to and attending his sports and school activities; preparing and planning the child's meals; caring for the child overnight; and attending to the child's medical and other health needs. The judge found both parties shared these primary custodial responsibilities.
The scope of appellate review of a trial court's fact-finding function is limited; the factual findings of the trial court are binding on appeal when supported by adequate, substantial, credible evidence. Cesare v. Cesare, 154 N.J. 394, 411-12, 713 A.2d 390 (1998); Rova Farms Resort Inc. v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974). Here, the factual *824 findings of the judge are fully supported by substantial, credible evidence contained in the record.
The judge's conclusion that the custodial relationship of the parties evolved over the years into one of shared physical custody, where neither parent could be considered as the primary caretaker, is fully supported by those factual findings. The record is clear that not only did Ryan physically spend approximately half of his time with each parent, the parties also equally shared those custodial responsibilities that related to Ryan's day-to-day health, education and welfare. As such, the judge's conclusion that the traditional Cooper/Holder/Baures removal analysis was inapplicable, was correct.
The trial judge carefully analyzed plaintiff's application as one seeking a change of custody and considered the best interests of Ryan with reference to the statutory criteria set forth in N.J.S.A. 9:2-4c.
Based upon our careful review of the record in the light of the oral and written arguments advanced by the parties, we affirm substantially for the reasons articulated by Judge Robert C. Wilson in his comprehensive and thoughtful oral opinion delivered on September 17, 2001. Based upon the findings of Judge Wilson, it is clear that plaintiff's application to remove Ryan from the State of New Jersey was properly rejected as an unwarranted change of custody.
Affirmed.