890 A.2d 1005 (2006)
383 N.J. Super. 114
Paula BARBLOCK, Plaintiff-Respondent,
v.
Joseph BARBLOCK, Jr., Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued January 10, 2006.
Decided February 10, 2006.
*1006 Paul Lomberg, Hackensack, argued the cause for appellant (Lomberg & Del Vescovo, *1007 attorneys; Mr. Lomberg, of counsel and on the brief).
Steven M. Segalas, argued the cause for respondent (Damiano Law Offices, attorneys; Mr. Segalas, of counsel and on the brief).
Before Judges SKILLMAN[1], AXELRAD and SABATINO.
The opinion of the court was delivered by
SABATINO, J.S.C., (temporarily assigned).
Defendant Joseph Barblock appeals the Family Part's order allowing his ex-wife, plaintiff Paula Barblock, to remove the parties' two minor children from New Jersey to the vicinity of Buffalo, New York. Defendant's main contention is that the trial court erred in failing to conduct a plenary hearing before granting plaintiff's removal application. Although we agree with defendant that a plenary hearing is usually required in contested removal cases, we find no reversible error due to the absence of such a hearing here. We also find unpersuasive the remaining points raised by defendant, and thus affirm the order entered below.
The parties met in Buffalo and were married in New York State on April 23, 1992. In 1993, the couple relocated to Wayne, New Jersey, where they lived for eleven years until their divorce.
The parties have two children from the marriage: a daughter born December 10, 1995, and a son born June 2, 1998. At the time of the proceedings below, the daughter was nine years of age and her brother was age seven.
It is undisputed that during their marriage the parties and their children frequently visited plaintiff's extended family in the Buffalo area. The family maintained a close relationship with the children's maternal aunts, uncles, cousins and grandparents who live in that region. Also, the parties and the children traveled yearly to Florida to visit the maternal grandparents who spent the winter there.
Eventually, the marriage deteriorated and plaintiff filed a complaint for divorce in Passaic County. The matter settled before trial, and an Amended Final Judgment of Divorce was entered on July 12, 2004. The judgment incorporated the terms of a Property Settlement Agreement ("PSA"). The PSA provided that the parties would share joint legal custody of the children, with the mother designated as the parent of primary residence. The father would have parenting time with the children "on a reasonable and liberal basis as the parties may agree[,] with [defendant] being entitled to at least every other weekend from Friday evening through Sunday evening, Tuesday and Thursday evenings and alternating holidays."
The PSA also provided that the marital home in Wayne, New Jersey, in which the plaintiff and children continued to reside when the final judgment of divorce was entered, would be listed for sale "on or before May 1, 2006."
The record is clear that the parties contemplated at the time of the divorce a potential relocation of plaintiff with the children. The parties had several discussions during the pendency of the divorce about plaintiff's desire to move back to the greater Buffalo area, and to bring along the children. The PSA acknowledged that the parties had been unable to reach *1008 agreement concerning such relocation, but did specify that "in the event plaintiff relocates. . . alimony and child support paid by defendant shall be subject to reconsideration."
Following the divorce, plaintiff enrolled in night classes at William Paterson College to obtain a master's degree in education and a certification to teach science. Plaintiff anticipated that she would pursue a teaching position upon the completion of her degree.
At the time of his appeal, defendant resided in Lyndhurst, New Jersey in a three bedroom home. Defendant is employed by a pharmaceutical company. The record indicates that he had regularly exercised his parenting time with the children following the divorce.
Evidently anxious to pursue her long-term goal of relocation, plaintiff applied to and was accepted for the fall 2005 term to D'Youville College in Buffalo, New York, where she would be able to complete her master's degree. This prompted plaintiff, with the assistance of counsel, to file a post-judgment motion in January 2005 for permission to relocate to the Buffalo area with the parties' two children.
In her moving papers, plaintiff explained that she wanted to live closer to her extended family (including her parents, three brothers, their wives and children, and other aunts and uncles), to attend school full-time with the help of those relatives, and to live and work permanently in or near Buffalo, a part of the country that she considers more affordable than New Jersey.
Defendant, also represented by counsel, filed a certification in opposition to plaintiff's removal application. Among other things, defendant alleged that (1) the post-divorce parenting of the children had been, in actual practice, a roughly-equal "shared custody" arrangement despite the PSA's grant of primary custody to the plaintiff; (2) if the children moved to Buffalo, no visitation schedule could maintain the level of his involvement in their extracurricular activities such as hockey, cheerleading, baseball and softball; (3) plaintiff's family members were openly hostile towards him, and her father and brothers have alcohol problems; and (4) the schools in the Buffalo area are inferior to those in Wayne, New Jersey. Defendant did not propose an alternative visitation schedule and did not cross-move for any affirmative relief.
Plaintiff's motion was heard by the same Family Part judge who had presided over the parties' uncontested divorce proceedings in 2004. After hearing oral argument on March 1, 2005, the judge granted plaintiff's application, allowing her to remove the children to the Buffalo area upon the end of that school year. The judge also permitted plaintiff to list the marital residence for sale immediately, notwithstanding the outside date of May 1, 2006 set forth in the PSA.[2]
The post-relocation visitation schedule approved by the trial court specified as follows:
A. Defendant shall have weekend parenting time with the children from Friday at about 8:30 or 9:00 p.m. until Sunday at 6:00 p.m. one time per month. The parties shall give preference to three-day weekends, if at all possible, recognizing that Plaintiff will initially be forfeiting a number of holidays attendant to weekends;

*1009 B. The Defendant is permitted to take the week that he has off from work in December each year, after Christmas, to visit with the children;
C. Holidays shall be alternated and rotated annually, provided those holidays are also during the time when the children were not in school;
D. Defendant is permitted to utilize the balance of his four weeks of vacation during the summer and take those with the children, in two (2) two-week blocks, which the parties shall coordinate at least thirty (30) days in advance of the summer;
E. Defendant and Plaintiff shall share in the driving of the children to and from Buffalo. They shall alternate responsibility for the driving in six-month intervals, meaning for six months the Defendant would come to Buffalo to pick up the children and for six months Plaintiff would come from Buffalo to New Jersey to drop off the children and pick them up. [Alternatively], the parties shall alternate the driving of the children on a monthly basis;
F. Defendant and Plaintiff shall obtain video camera equipment for their respective internet services to also permit visual contact between the Defendant and the children.
Defendant appealed the removal order and concurrently applied to the trial court for a stay of the order pending appeal. On April 5, 2005, the trial court denied the requested stay and we likewise denied a stay on June 20, 2005. Plaintiff and the children have since relocated to the Buffalo area.
We begin with the observation that child relocation issues often involve very difficult and emotional issues for the parties and their children, especially younger children. Given the increasing mobility of society, removal issues are more and more a staple of pre-divorce and post-divorce conflict between parents, and the subject of frequent motion practice before the Family Part. Such disputes often involve enormous tension between the interests of the primary custodial parent (and his or her legitimate concerns of employment, educational opportunity, proximity to loved ones and personal well-being) and the interests of the non-custodial parent (and his or her similarly legitimate concerns of personal fulfillment and in maintaining and nurturing relationships with the children).
Trial judges increasingly are asked to referee such conflicts between custodial and noncustodial parents, which often have no optimal solutions and which inevitably require both parents to undertake a substantial degree of sacrifice.[3] The courts must hear such matters in a time-sensitive context, recognizing that children caught in the middle of relocation disputes are often plagued with uncertainty about their futures and suffer the ripple effects of the acrimony between their parents. Therefore, we approach our review of relocation orders with sensitivity to the special challenges faced by the trial bench in such difficult matters.
The law in this area is well established and is not disputed by counsel. N.J.S.A. 9:2-2 provides that a child who was born in this State or who has resided within its limits for five years may not be relocated by a parent from the State of New Jersey, absent the consent of both parents or an order from the court finding sufficient cause to permit such a move.
Upon finding that the removal statute applies, as it does here, the court must *1010 then determine the extant status of custody of the parties' children. If the situation is such that one parent serves as the primary caretaker, then that custodial parent's request to relocate the children is governed by the two-part test of Baures v. Lewis, 167 N.J. 91, 770 A.2d 214 (2001). Baures requires the removal to be granted where the proofs demonstrate that (1) there is a good faith reason for the move and (2) that the move will not be inimical to children's best interests. Id. at 118, 770 A.2d 214.
If, conversely, the situation is a rare de facto "shared parenting" arrangement, one in which each parent essentially performs an equal caretaking role, then the removal application must be analyzed under the stricter change-of-custody test of O'Connor v. O'Connor, 349 N.J.Super. 381, 399-400, 793 A.2d 810 (App.Div.2002). The O'Connor standard hinges solely upon an analysis of the best interests of the children, regardless of the applicant's good faith motivation to relocate. In such instances, "the party seeking the change in the custodial relationship must demonstrate that the best interests of the child[ren] would be better served by residential custody being vested primarily with the relocating parent." Id. at 398, 793 A.2d 810; see also Chen v. Heller, 334 N.J.Super. 361, 380-82, 759 A.2d 873 (App. Div.2000).
Defendant argues that the trial court improperly failed to conduct a plenary hearing before applying these settled legal principles to the facts of this case. He argues that the court was obligated to conduct a plenary hearing on two issues: first, as to defendant's claim that plaintiff was not, in actuality, the primary caretaker and that this was a true shared parenting scenario governed by O'Connor, and, second, depending upon the resolution of the first issue, in assessing the pertinent factors under either the O'Connor test or the Baures test. We disagree.
No reported case holds that a plenary hearing is inexorably required to resolve contested applications to relocate a child from the State of New Jersey. To be sure, such evidentiary proceedings usually will be required to sort out competing factual and expert assertions about the merits of the proposed removal. The credibility of the parties' contentions may wither, or may be fortified, by exposure to cross-examination and through clarifying questions posed by the court. Depending upon the ages and maturity of the children involved, the court may wish to exercise its discretion to interview them in chambers pursuant to R. 5:8-6. Expert testimony, whether through professionals retained by the parties or appointed by the court under R. 5:3-3, may offer helpful insights about the likely impact of a move upon the children, and about the prospects that a visitation plan will guarantee regular communication and contact of a nature and quality to sustain relationships with the non-custodial parent. See Baures, supra, 167 N.J. at 97, 770 A.2d 214.
Notwithstanding these benefits that can be derived from plenary hearings in removal cases, Family Part judges must also bear in mind the costs, both financial and personal, that the litigants will incur in preparing for and participating in such proceedings. Experts often will need to conduct joint and separate interviews of the children and the parents, review pertinent documents and administer appropriate psychological tests before issuing a written report. Opposing counsel may wish to pursue discovery from the parties and from any other anticipated witnesses before the hearing. Documents may need to be located, exchanged and marked for trial. All of these steps will consume time and money. In the meantime, the children *1011 and their parents are placed in an anxious state of limbo, unsure if the removal application will be granted or denied, and unable to make solid plans for the future. Indeed, the job offer or other opportunity that sparked the removal application may dissipate in the interim.
Given these competing, and highly contextual, practical considerations, we continue to eschew any per se rule that would mandate plenary hearings in all contested removal cases. For example, in Pfeiffer v. Ilson, 318 N.J.Super. 13, 722 A.2d 966 (App.Div.1999), we upheld a trial court's order granting a removal application without a plenary hearing, in circumstances where a mother wished to move the children from New Jersey to California while their father remained living in Chicago. In Pfeiffer, we emphasized that "a plenary hearing is not necessary in every case where removal of children is at issue, but rather only where a prima facie showing has been made that a genuine issue of fact exists bearing upon a critical question such as the best interests of the children, interference with parental rights, or the existence of a good faith reason to move." Id. at 14, 722 A.2d 966.
Although the factual setting here is not as extreme as that in Pfeiffer, we agree with the trial court that a plenary hearing was not required in this case. The trial judge heard extensive oral argument on the motion, considered all of the written submissions of the parties and evaluated those proofs in light of the applicable law. Ultimately, the trial judge concluded that a plenary hearing was unnecessary because the defendant had failed to muster adequate reasons to forestall the plaintiff's move to Buffalo. There was no "genuine issue of fact ... bearing upon a critical question" under the removal standards to warrant a full-blown trial. Ibid.
On the threshold question of custody, we concur with the trial judge's assessment that there was not a shared parenting arrangement between these parties and that plaintiff served as the primary caretaker of the two children.
Defendant asserted in his certification that, despite the language of the PSA affording him less parenting time, he in fact looked after the children on six out of every fourteen nights because of plaintiff's attendance in night school. Defendant claimed that he "probably spen[t] as much of their waking time with them as [did] plaintiff." Plaintiff, on the other hand, asserted that defendant visited with the children for the two weekday evenings assigned to him under the PSA, and that the parties simply had arranged for those evenings to coincide with her class schedule. Plaintiff acknowledged, however, that during one semester of her schooling defendant did keep the children overnight at his residence once per week.
Even assuming that defendant's version of the children's schedule is true, the circumstances still do not rise to the level of shared parenting envisioned by O'Connor. We emphasized in O'Connor "the importance of analyzing the division of time in the context of each party's responsibility for the custodial functions, responsibilities and duties normally reposed in the primary caretaker ... [.]". O'Connor, supra, 349 N.J.Super. at 400, 793 A.2d 810. Further in O'Connor, we expanded upon what is included within a primary caretaker's role:
key custodial responsibilities, such as bringing the child to and picking the child up from school; helping the child with his homework assignments; bringing the child to and attending his sports and school activities; preparing and planning the child's meals; caring for the child overnight; and attending to *1012 the child's medical and other health needs.
[Id. at 400, 793 A.2d 810.]
When measured by these factors, defendant's opposing certification failed to provide an adequate foundation to support a finding that defendant's role was that of a true joint caretaker with day-to-day responsibilities for the children commensurate with those of the plaintiff.
Although defendant stressed that the children slept at his residence one weeknight per week (plus two overnights on alternating weekends) and that he attended their recreational activities on a weekly basis, his motion papers conspicuously did not mention who regularly cooked their meals, who helped with their homework, who got them ready for school, who took them to doctor's visits, and so on. His certification described "spending three week nights with [the children] so that their mother does not have to hire a babysitter." The trial judge highlighted that description, characterizing defendant's weeknights with the children as "babysitting time," terminology suggestive of defendant fulfilling a subordinate, rather than joint, caretaking role.
Additionally, defendant did not assert, by a cross-motion for custody or otherwise, that he was ready, able and willing to take on the role of primary caretaker if plaintiff chose to relocate to Buffalo without the children. Defendant's papers simply resisted plaintiff's move, and omitted any indication that he was prepared to accept responsibility for the children as a fulltime or primary custodial parent. That omission further justifies the trial judge's treatment of this case under the Baures standard.
Viewing the record as a whole, we also perceive ample proof to support the trial judge's determination that plaintiff's application substantively met the two prongs of Baures, and that no live testimony was required to confirm that showing. Plaintiff raised multiple good faith reasons for wanting to move to the Buffalo area: higher education, long-term job prospects, proximity to extended family and reduced living costs. Nothing in defendant's opposing papers showed that plaintiff's desire to move was pretextual or malicious. The first prong of Baures was readily fulfilled.
As to the second prong of Baures, we also find substantial evidence in the record to sustain the trial court's conclusion that the relocation would not be inimical to the children's best interests. Although defendant criticized the school system in the greater Buffalo area, he failed to document those criticisms with competent expert proof. His allegations of antipathy by his former in-laws and of their alleged excessive drinking are also uncorroborated.
Also, defendant offered no alternative visitation plan that would increase the quantity and quality of his time with the children in a realistic fashion. He simply adopted a "just say no" posture to the motion, without coming forward with sufficient competing proofs showing that the move would be harmful to the children. See Holder v. Polanski, 111 N.J. 344, 353, 544 A.2d 852 (1988)(noncustodial parent opposing removal must produce evidence not just that visitation will change after the relocation, but that such a change will negatively affect the children). Indeed, in his oral opinion, the trial judge emphasized that defendant had not alleged that the children had expressed resistance to the move, or that they preferred to remain in New Jersey. Defendant did not identify any specific harm to the children, other than speculation. By contrast, the trial judge found, and we agree, that plaintiff had conducted substantial investigation *1013 into the benefits and logistics of her proposed move before filing her application.
Although defendant's certification stated that he would hire an expert to perform a psychological study to assess the impact of the proposed relocation on the children's personalities, defendant ultimately did not retain such an expert. Nor did he press the court to appoint a neutral expert before it decided plaintiff's motion. He also did not request the court to interview the children, or supply the court in writing with proposed questions for such interviews.
We have considered the merits of plaintiff's visitation plan, which was ratified by the trial court. The plan appears, by all indications, to be reasonable on its face and faithful to the objectives of Baures in fostering the children's relationship with their non-custodial parent. As noted above, the plan, among other things, entitles defendant to monthly visits with the children and substantial holiday and vacation time, with plaintiff fairly sharing in transportation costs and transfer responsibilities. The plan also calls for regular contact through the internet and video technology. Defendant offered no better alternative.
In sum, we see no reason to vacate the removal order and compel a plenary hearing that would only disrupt the lives of the parties and their children and be very unlikely to lead to a different outcome. We thus affirm the Family Part's order, but caution that in doing so we do not encourage trial judges to forego plenary hearings in removal cases in the common situation where there are genuine issues of material fact.
Affirmed.
NOTES
[1] Judge Skillman did not participate in oral argument. With the consent of counsel, he has joined in this opinion.
[2] Although defendant included a claim in his appeal that the trial judge had prematurely authorized the sale of the marital home, we were advised at oral argument that the claim is now moot, because he has since acquired title to the home.
[3] See Leslie Eaton, Divorced Parents Move, and Custody Gets Trickier, N.Y. Times, August 8, 2004 (reporting the increase of relocation cases throughout the country).