788 A.2d 795 (2002)
346 N.J. Super. 493
Lynn A. MAMOLEN, Plaintiff-Appellant,
v.
Lon E. MAMOLEN, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued Telephonically October 25, 2001.
Decided January 15, 2002.
*796 Mark Biel, Atlantic City, argued the cause for appellant (Russell and Loder, and Mairone, Biel, Zlotnick & Feinberg, Atlantic City, attorneys for appellant; Richard A. Russell, Ocean City, and Mark Biel, of counsel and on the brief).
Nancy R. Mazin, Ventnor City, argued the cause for respondent.
Before Judges CUFF, WINKELSTEIN and CLARKSON S. FISHER, Jr.
The opinion of the court was delivered by CLARKSON S. FISHER, Jr., J.S.C. (temporarily assigned).
One month after entry of the divorce judgment, Lynn Mamolen ("Lynn") applied for permission to relocate to Lutherville, Maryland with the three children of her marriage to Lon Mamolen ("Lon"). After a seven-day hearing, the trial court rejected that application, finding the parties were in a joint custody relationship which avoided the traditional standards applied in such matters. Because the evidential record does not support the trial court's finding of a joint custodial relationship, we reverse and remand for further proceedings consistent with the methodology for considering removal of children from the jurisdiction as outlined in Baures v. Lewis, 167 N.J. 91, 770 A.2d 214 (2001).

I
The Supreme Court recently analyzed, once again, the proper approach to be taken when a divorced parent seeks to permanently remove the children of the marriage from the State. In Baures v. Lewis, the Court recognized that the seminal question is whether "it is a removal case or whether by virtue of the arrangement between the parties, it is actually a motion for a change in custody." If the parties' situation presents a true shared custodial relationship, then the right to remove a child, or children, from the jurisdiction requires a determination of whether there should be a change in the custodial arrangement. If, however, the custodial relationship is of the type more commonly found in most post-divorce situations where one parent has the larger share of physical custody of the childrenthen the right to remove follows the process which has evolved from Cooper v. Cooper, 99 N.J. 42, 491 A.2d 606 (1984), to Holder v. Polanski, 111 N.J. 344, 544 A.2d 852 (1988), and lastly to Baures v. Lewis.[1] In essence, the right to remove when there is a true joint custody relationship turns on the "best interests" of the child, or children. When, however, there is some lesser shared relationship, then the right is governed by the "template" and the numerous factors set forth in Baures. This latter *797 process includes the moving party's demonstration of a "good faith reason for the move and that the child will not suffer from it," and then a demonstration by the opposing party that the move is "either not in good faith or inimical to the child's interest." 167 N.J. at 118-19, 770 A.2d 214.
Experience informs that the ultimate outcome of such matters often turns on the placing of the burden of persuasion.[2] Accordingly, the question of whether a parenting relationship is truly shared has a significant impact on whether a parent will be permitted to remove a child from the jurisdiction. In recognizing that the Cooper/Holder analysis is inapplicable to a true shared custodial relationship, in Baures our Supreme Court expressly stated its agreement with Voit v. Voit, 317 N.J.Super. 103, 721 A.2d 317 (Ch.Div. 1998), where the parties' parenting relationship negated the relevance of the "sincere, good faith reasons" of the parent seeking removal and permission to remove turned on the "best interests" of the children. 167 N.J. at 114-15, 770 A.2d 214.
Because the trial court determined that the present situation is similar to Voit and the Cooper/Holder analysis inapplicable, our review of the trial court's denial of removal must initially focus on whether the Mamolens' relationship to each other and their children constitutes a true joint custodial relationship.

II
In considering the nature of the custodial relationship in this case, it is helpful but not conclusive to examine how the relationship was fixed by the judgment of divorce. In this case, the parties settled their custodial disputes by way of a separation agreement. The Mamolens agreed they would have
joint custody of the children born of the marriage with the Wife designated as the Parent of Primary Residence (PPR). The Husband shall be designated as the Parent of Alternate Residence (PAR). The children will spend alternate weekends with the Husband with the beginning and ending of the weekend to be agreed upon by the parties. Weekend parenting time shall consist of three (3) consecutive overnights, either Friday, Saturday and Sunday, or Thursday, Friday and Saturday. In addition to weekend parenting, the children may spend one (1) over-night every other week with the Husband.
The parties also agreed to alternate significant holidays and "grant[ed] the other a right of first refusal of additional parenting with the children in the event that either parent, or a member of his/her immediate family (e.g. the children's grandparent or future stepparent) is unable to personally provide care to the children for 12 hours or more during the normal parenting schedule."
Their separation agreement also states that
The Husband and Wife shall keep open communications between themselves and the children to share information concerning the health and educational progress of each of the children, and to permit the children to communicate freely with the other parent.
In short, the parties agreed to an arrangement whereby the children would spend alternating weekends and one overnight every other weekapproximately 29% of their timewith Lon.
*798 The findings of the trial judge do not suggest that this arrangement changed through any subsequent course of conduct. The only change observed by the trial judge related to an improvement in the quality of the relationship between Lon and the children. We understand the trial judge's findings as being more aligned with Dr. Fred Gross, Lon's expert, than Dr. Jane Rittmayer, Lynn's expert.[3] Since Dr. Gross recognized Lynn as the "primary caretaker" of the two younger children, the trial court's finding of a joint custodial relationship is inconsistent, at least with regard to the two younger children, with the trial judge's other findings. Notwithstanding this internal inconsistency, the trial judge's other findings of fact do not support the ultimate determination that this case presents a joint custodial relationship.

III
We initially state our agreement with the trial judge that defining the true essence of a custodial relationship does not turn on the labels utilized by the parties. It has long been de rigueur for divorcing parents to recite in their separation agreements that they will share "joint custody" of their children. Such was the case here. However, such labels do not provide conclusive proof of the relationship's inherent nature. Our family courts are courts of equity and are bound not by the form of agreements, only substance. See, e.g., Applestein v. United Bd. & Carton Corp., 60 N.J.Super. 333, 348, 159 A.2d 146 (Ch.Div.) ("The courts of equity in New Jersey, and elsewhere, have never hesitated to look behind the form of a particular ... transaction" and determine that it is something else "regardless of its deceptive outward appearance"), aff'd o.b., 33 N.J. 72, 161 A.2d 474 (1960). In short, while the terms of the parties' separation agreement might be probative of their intentions, a court of equity is not only freed from but obligated to determine the true nature of the relationship regardless of labels and artificial descriptions.
In fact, in the landmark decision of Pascale v. Pascale, 140 N.J. 583, 660 A.2d 485 (1995), the parties also entered into an agreement to share joint legal custody of their children. The Court found it not to be so. Redefining the terms then utilized commonly in our family courts, the Pascale Court "discard[ed]" the term "joint custody" and "recommend[ed] that in the future parties differentiate between the terms `legal custody' and `physical custody' in defining their status and the forms of relief that they are seeking from the court." 140 N.J. at 595, 660 A.2d 485. Notwithstanding, the term "joint custody" continues to be used at times without differentiating from "legal custody" and "physical custody." Such is the case here.
In providing guidance for such undefined situations, the Pascale Court reiterated its earlier decision in Beck v. Beck, 86 N.J. 480, 487, 432 A.2d 63 (1981), declaring that the concept of "joint custody" encompasses both legal and physical custody. The Court defined joint "legal" custody as meaning the "authority and responsibility for making `major' decisions regarding the child's welfare." Joint "physical" custody *799 was defined as constituting joint responsibility for minor day-to-day decisions and "the exertion of continuous physical custody by both parents over a child for significant periods of time." 140 N.J. at 596, 660 A.2d 485. Recognizing also that joint legal custody is common but joint physical custody rare, it is important to focus on the physical custody aspect of the arrangement. In this case, the trial judge found it to be "an artificial analysis" which merely counts the days the children are with each parent. While we recognize that it is both impractical and undesirable to attempt to create a bright-line rule, we find the trial court's disregard for this factor to be erroneous.
In Pascale, the Court described joint physical custody by referring to typical examples such as "spending three entire days with one parent and four entire days with another parent or alternating weeks or even years with each parent." 140 N.J. at 596-97, 660 A.2d 485. Thus,
the import from the voluminous literature on the subject is that "joint physical custody" means that the child lives day in and day out with both parents on a rotating basis. Numerous "parenting times" with a child do not constitute joint physical custody; to constitute joint custody, each parent must exert joint legal and physical custody over the child.

[140 N.J. at 597, 660 A.2d 485.]
Accordingly, while a court may look past labels and imprecise language utilized to describe a custodial arrangement, the element of time is of critical importance in determining the presence of joint physical custody. The trial judge's rejection of the importance of the parties' division of time with their children was mistaken.
As noted earlier, the parties' agreement called for the children to be with Lon only for three "overnights" every other weekend and one other "overnight" every fortnight. That is, the children are overnight in Lon's home four nights out of every fourteen, i.e., approximately 29% of the time. We, too, reject the notion that a particular custodial arrangement includes joint physical custody once it passes a particular time line. But we must embrace what Pascale has said; that joint physical custody means something far closer to 50% than what is presented here. Since Baures found the example of Voit to be an acceptable paradigm of the exceptional case which avoids Cooper/Holder, a closer examination of the facts and the thoughtful opinion of Judge Michael Brooke Fisher in Voit is helpful in understanding the importance of the time element in the analysis.

IV
The Voits were well traveled. They met while both attended the University of Rochester in New York. They married while Dr. Voit was in medical school in Rochester and, after his internship, they moved to Oregon where Dr. Voit secured a surgical residency in general orthopaedics. Their only child, Garet, was born in Oregon. A few years later, they moved to New Mexico so Dr. Voit could pursue a one-year fellowship in hand and micro-vascular surgery. By this time, however, their marriage was on shaky ground. While in New Mexico, Mrs. Voit obtained a separate residence. Notwithstanding, from the beginning of their separation they both attempted to maximize the time Garet spent with the other as opposed to third-party caretakers. Their separation agreement provided for "joint legal and physical custody" and imposed an obligation that they "mutually consult and agree on major matters including living arrangements." 317 N.J.Super. at 109, 721 A.2d 317. The agreement also provided *800 that Dr. Voit would have Garet in his care each week from Thursday evening at 6 p.m. through Monday morning at 9 a.m., i.e., 50% of the time. The parties also acknowledged they "consistently deviated from any set schedule so as to maximize Garet's time with each party," but "always maintained a close parity in the time that they spen[t] with Garet." 317 N.J.Super. at 109-110, 721 A.2d 317.
The Voits thereafter moved to New Jersey in 1996 where Dr. Voit joined a medical office engaged in orthopaedics. Even though they were still finalizing their divorce at that time, the Voits cooperated with respect to the move to New Jersey; in fact, Mrs. Voit visited New Jersey in advance and helped select both parties' future residences. In 1999, Dr. Voit decided he was unhappy with his career and sought employment with a teaching hospital. Eventually, he located what he viewed as a superior job opportunity at the University of Arizona, thus giving rise to his application for permission to remove Garet from New Jersey to Arizona.
The Voits had continued their shared parental relationship throughout their separation. At their hearing, it was stipulated that both Voits "have equal parenting skills and that the child is bonded equally well to both"; Judge Fisher also "was impressed with the ability of the parties in the past to cooperate to a remarkable degree in order to achieve the best for their child" and "[a]s a result of that cooperation, each is intimately and equally involved with their child on virtually a daily basis and the child is ... `thriving, well adjusted and happy.'" 317 N.J.Super. at 114-15, 721 A.2d 317. As a result, it was determined that "legal and physical custody" of Garet was "truly shared" and because of the "unique facts" presenting this "totally shared-parenting arrangment," Voit was found to present a situation which avoided the traditional Cooper/Holder approach. 317 N.J.Super. at 106, 721 A.2d 317. See also, Chen v. Heller, 334 N.J.Super. 361, 759 A.2d 873 (App.Div. 2000).

V
As we have observed, the trial judge appropriately discarded the impact of the labels used by the parties, but erroneously neglected the importance of the division of time in the custodial arrangement. The trial judge focused on the emotional relationship as being critical. While this factor has importance, we find the trial judge's sole reliance on this factor to be erroneous. Indeed, if an emotional tie between the children and the parent seeking to prevent their removal from the State was the sole critical factor in ascertaining the true nature of the custodial relationshipwhich is what we understand the trial court concludedthe Voit exception would expand to most every custodial situation.
We also find the trial court's failure to consider the nature of the relationship between these divorced parents erroneous. As we emphasized recently, "the allocation of the amount of time each parent spends with the child is not the sole basis for determining whether the parties should share `joint legal custody' of their child." Nufrio v. Nufrio, 341 N.J.Super. 548, 549-50, 775 A.2d 637 (App.Div.2001). Rather, along with a consideration of the elements of joint legal and physical custody, we emphasized in Nufrio that "the prime criteria for establishing a joint legal custodial relationship ... centers on the ability of those parents to agree, communicate and cooperate in matters relating to the health, safety and welfare of the child notwithstanding animosity or acrimony they may harbor towards each other." Id. at 550, 775 A.2d 637.
*801 The trial judge centered his findings almost entirely upon the advances made by Lon in his parenting skills, his increased involvement in the school and extra-curricular activities of the children, and the close relationship and bonds that exist among Lon and the children. The trial judge's findings do not suggest the existence of joint decision-making and cooperation between Lon and Lynn regarding the welfare of the children. The record, in fact, demonstrates a particular lack of any sharing by both Lon and Lynn in decision-making concerning the children. The absence of such evidence further demonstrates the absence of a Voit-like custodial relationship.
Further error can be found in the conclusions of the trial judge in over-emphasizing the relationship between parent and child which has a lesser, different role in removal actions than in custody disputes. As the Court said in Baures:
When initial custody is decided, either by judicial ruling or by settlement, the ultimate judgment is squarely dependent on what is in the child's best interests. Whoever can better advance the child's interests will be awarded the status of custodial parent.
Removal is quite different. In a removal case, the parents' interests take on importance. However, although the parties often do not seem to realize it, the conflict in a removal case is not purely between the parents' needs and desires. Rather, it is a conflict based on the extent to which those needs and desires can be viewed as intertwined with the child's interests. Cooper, and more particularly, Holder, recognize that subtlety by according special respect to the liberty interests of the custodial parent to seek happiness and fulfillment because that parent's happiness and fulfillment enure to the child's benefit in the new family unit.
[167 N.J. at 115-16, 770 A.2d 214 (citations omitted).]
The trial court's ultimate conclusion mistakenly found the relationship between Lon and the children pivotal, whereas, as the Court in Baures observed, the parents' interests, and the relationship of those interests to the children, take on greater importance.

VI
It is abundantly clear that Voit presents a rare instance of "joint legal custody." Six years ago in Pascale, the Court examined empirical evidence which demonstrated the uniqueness of "joint legal custody." The Court noted that a true shared custodial relationship was found to exist in only ten percent of custody agreements in Massachusetts and was "rare both in Vermont and New Hampshire." 140 N.J. at 596, 660 A.2d 485. The Court also concluded that its "review of New Jersey cases leads us to believe that `joint physical custody' is as rare here as it is in other states." Id. at 597, 660 A.2d 485. Indeed, our experience similarly informs us that the type of custody arrangement described in Voit is rare and that the Mamolens' custodial relationship, wherein Lynn is clearly the primary physical caretaker, is quite common and represents the large majority of custody relationships.
We therefore find the trial court's attempt to squeeze this custodial relationship into the narrow Voit exception additionally mistaken for the reason that it would, if upheld, utterly eviscerate Cooper/Holder/Baures. We cannot imagine the Supreme Court intended the removal procedures it has repeatedly declared would only be applied in such a small subset of cases or that the Voit exception (which the Court expressly embraced in *802 Baures) would be allowed to swallow the procedures so carefully honed from Cooper to Holder to Baures. Accordingly, we reverse the order of May 2, 2001 which denied Lynn's application for removal.

VII
We remand the matter to the trial court to reconsider the evidence that was previously adduced and to also provide the parties with the opportunity to submit such additional evidence as may be warranted in light of our opinion and in light of the passage of time. Because the evidence does not support a finding of a joint custody relationship, the matter of removal must be considered against the "template" set forth by the Court in Baures. 167 N.J. at 116-23, 770 A.2d 214.
The order of May 2, 2001 is reversed and the matter remanded for further proceedings in conformity with this opinion. We do not retain jurisdiction.
NOTES
[1] The restriction on a parent removing a child of divorce from the jurisdiction comes from the Legislature. N.J.S.A. 9:2-2 states, "When the Superior Court has jurisdiction over the custody and maintenance of the minor children of parents divorced, separated or living separate, and such children are natives of this State, or have resided five years within its limits, they shall not be removed out of its jurisdiction against their own consent, if of suitable age to signify the same, nor while under that age without the consent of both parents, unless the court, upon cause shown, shall otherwise order." What constitutes sufficient cause for removal was left to be defined by the courts.
[2] The Baures Court recognized that the burden on a custodial parent in seeking to remove a child from the jurisdiction is not "particularly onerous." 167 N.J. at 118, 770 A.2d 214.
[3] The trial judge's written findings consist of an outline of the testimony of the lay and expert witnesses and then concluded: "Therefore, the court rejects Dr. Rittmayer's description as Mr. Mamolen being merely a `visiting parent.' In light of all of the above, the court concludes that Mr. Mamolen is a true joint custodial parent" (emphasis added). We assume that by referring to "all of the above" as support for this finding, and because of the rejection of Dr. Rittmayer's views, the trial judge found Dr. Gross' expert testimony persuasive.