12 A.3d 192

PAUL MORGAN, PLAINTIFF–APPELLANT, v. KRISTIN MORGAN (N/K/A LEARY), DEFENDANT–RESPONDENT.

Argued November 9, 2010—Decided February 8, 2011.

*Karin Duchin Haber* argued the cause for appellant (*Haber Silver & Simpson*, attorneys; *Jani Wase Vinick*, on the briefs).

*Jennifer L. McInerney* argued the cause for respondent (*Laufer, Dalena, Cadicina, Jensen & Boyd*, attorneys).

Justice LONG delivered the opinion of the Court.

After a divorce, applications by a custodial parent[1] to relocate with the children are fairly common. For all their ubiquity, however, such requests present us with difficult and often heart-wrenching decisions.

> Inevitably, upon objection by a noncustodial parent, there is a clash between the custodial parent's interest in self-determination and the noncustodial parent's interest in the companionship of the child. There is rarely an easy answer or even an entirely satisfactory one when a noncustodial parent objects. If the removal is denied, the custodial parent may be embittered by the assault on his or her autonomy. If it is granted, the noncustodial parent may live with the abiding belief that his or her connection to the child has been lost forever.
>
> [*Baures v. Lewis*, 167 *N.J.* 91, 97, 770 *A.*2d 214 (2001).]

Our evolving case law has attempted to balance those competing interests. *See, e.g., Holder v. Polanski*, 111 *N.J.* 344, 544 *A.*2d 852 (1988); *Cooper v. Cooper*, 99 *N.J.* 42, 491 *A.*2d 606 (1984). Most recently, in *Baures*, we clarified the two-pronged standard for resolving such a matter: a custodial parent will be permitted to move if (1) that party has a good faith reason to do so, and (2) the children will not suffer from the move. *Baures, supra*, 167 *N.J.* at 118, 770 *A.*2d 214. To aid in that analysis, we set forth a metric consisting of twelve relevant considerations. *Id.* at 116–17, 770 *A.*2d 214.

Here, a mother sought to move with her children to another state where her fiancé and her extended family were located. The father objected. In 2006, the trial judge blocked the move,

---

[1] In *Pascale v. Pascale*, 140 *N.J.* 583, 660 *A.*2d 485 (1995), we expressed a preference for the term "primary caretaker" over the interchangeable term "custodial parent." *Id.* at 597–98, 660 *A.*2d 485. However, because the case law relevant to the issues before us has continued to employ the term "custodial parent," we do likewise.

declaring that the mother did not have a valid reason to go and that the children would be harmed thereby.

In 2007, both parties appealed and in 2010 the Appellate Division reversed the denial of relocation because the trial court's conclusions were not supported by the record, permitted relocation, and remanded solely for proceedings to expedite the move. We granted the father's petition for certification and now affirm and modify. We agree with the appellate panel that the trial judge's analysis was seriously flawed and warranted reversal. However, the scope of the Appellate Division's remand order was too narrow. Enormous changes in the lives of the parties and their children have occurred over the four years since the trial court's decision. Thus, we hold the remand requires an assessment of the *Baures* factors in light of present-day realities.

## I.

Paul Morgan and Kristin Leary were married on April 11, 1992. Two daughters were born of the marriage—Anna on November 22, 1998, and Greta on June 29, 2001. Morgan and Leary divorced on August 16, 2005. The final judgment of divorce incorporated a March 2005 Property Settlement Agreement (PSA), which provided for joint legal custody of the children, indicated that Leary would be the "parent of primary residence," [2] and detailed a parenting-time schedule. The schedule provided that Morgan would have the girls on alternate weekends beginning Friday evening and ending Monday evening, every Thursday night until Friday morning, and every Tuesday evening for dinner. Holidays would be alternated and each parent would have the children for one week of vacation during the school year and one during the summer.

On November 23, 2005, in anticipation of an application by Leary to move with the children to Massachusetts, Morgan filed a

---

[2] That term appears in Child Support Guidelines, Pressler & Vernicro, *Current N.J. Court Rules*, Appendix IX–A to *R.* 5:6A (2011).

motion seeking a re-determination of custody based on "a substantial change in circumstances." He contended that he should be designated the parent of primary residence because he saw the girls more than the PSA provided and was very involved in their school and recreational activities. He also requested a custody evaluation and an order limiting Leary's trips with the girls to Massachusetts where James Mambro, her new boyfriend, was located. The motion was based on what Morgan characterized as Leary's volatile personality; the children's chaotic lives, as evidenced by their excessive visits to Massachusetts; and Leary's expressed desire to move to Massachusetts, which Morgan claimed violated one of the fundamental underpinnings of the PSA: that Leary would remain in New Jersey with the girls.

On January 11, 2006, Leary opposed Morgan's motion and filed a cross-motion seeking permission to move with their daughters to Massachusetts or, alternatively, a plenary hearing. In support of her request to relocate, Leary pointed to the fact that Massachusetts is her home state; her entire family resides there; she was by then engaged to Mambro, a Massachusetts resident; that her marriage would enable her to forego employment and become a "stay-at-home" mother; and that the PSA was not based on her promise to remain in New Jersey. Morgan filed a reply certification disputing Leary's assertions and underscoring her emotional volatility which he claimed would render the proposed relocation away from him harmful to their children.

The trial judge denied Morgan's motion to re-determine custody because there was no change in circumstances from the time of the divorce. The judge also rejected Morgan's contention that he and Leary actually had a *de facto* shared custody arrangement, notwithstanding the PSA. In ruling, the judge declared Leary to be the parent of primary residence, warranting application of the relocation principles of *Baures;* denied Leary permission to move the children to Massachusetts, but granted her request for a plenary hearing; and appointed a forensic psychologist, Dr. Edwin Rosenberg, to perform the relocation evaluation. Morgan re-

tained a clinical psychologist, Dr. Amie Wolf–Mehlman, to evaluate the issues.

Both experts interviewed the parties, the children, and Mambro, and observed each of the parties with the children. They also reviewed relevant records and conferred with collateral sources, including two therapists whom the parties saw at times from 2000 to 2004. Additionally, Dr. Rosenberg administered psychological tests to the parties and Mambro, the results of which were reviewed by Dr. Wolf–Mehlman.

Dr. Rosenberg's August 26, 2006 report concluded that Leary did not suffer from any significant emotional problems and that she was sincere in her desire to be closer to her family and to spend more time with the girls, which would be facilitated by her marriage to Mambro. The report, which recommended approval of the move, proposed an extensive parenting-time schedule that would foster Morgan's bond with the children, which Dr. Rosenberg recognized as an important one. Dr. Rosenberg found several of the psychometric tests' results to be invalid, but nevertheless concluded that Leary was not emotionally unstable. He also declined to rely on the opinions of prior therapists because they were stale; because the therapists had not focused on the relocation issue and had not interviewed the children; and because they were in a continuing relationship with Morgan, and thus should not have opined on the issue at all. Dr. Rosenberg concluded that Leary should be permitted to move with the girls at the end of the school year.

Dr. Wolf–Mehlman's December 27, 2006 report, which was based on the incorrect assumption that there was *de facto* shared custody, recommended either that a true joint custody arrangement be implemented or, if that was not possible, that Morgan receive primary residential custody. Although Dr. Wolf–Mehlman concurred in Dr. Rosenberg's psychological assessment of Leary to the extent that she recognized that Leary did not suffer psychopathology in terms of an actual disorder, she nevertheless concluded that Leary was emotionally unstable. She relied on the

reports of non-testifying experts as support for her conclusion, including the reports of the counselors who had treated the couple during the breakdown of their marriage, one of whom continued to treat Morgan at the time of the hearing. Those therapists had not seen Leary for six and two-and-one-half years, respectively, and never interviewed the children. She also relied almost exclusively on conversations she had with Dr. Frank Dyer, an expert in psychometric testing, as the basis for the conclusions in her report regarding the testing. Dr. Wolf–Mehlman concluded that the move should not be permitted.

On February 28, 2007, Morgan moved *in limine* for the application of the "best interests" standard to the impending relocation hearing based on his view that he and Leary actually had *de facto* shared custody of the children, notwithstanding the PSA. Leary opposed the application and characterized Morgan's request as one "to change the scope of the relocation hearing." The trial court denied Morgan's *in limine* motion, which it treated as a motion for reconsideration in light of its prior ruling on the subject, and concluded, as it had previously, that the record did not warrant a plenary hearing on *de facto* shared custody.

Thereafter, the trial court denied Morgan's motion for a stay of the plenary hearing on relocation. Morgan moved for leave to appeal and for a stay, both of which were denied. The relocation hearing took place from May 22 to June 4, 2007. A number of witnesses testified, including Morgan, Leary, Leary's parents, Mambro, Dr. Rosenberg, Dr. Wolf–Mehlman, and the children's teacher. On June 13, 2007, the trial court entered an order denying Leary's cross-motion for permission to relocate with the children to Massachusetts. In a letter opinion, the court noted that "the principal issue that emerges from trial is [Leary]'s emotional state." It then reviewed the testimony of Drs. Rosenberg and Wolf–Mehlman and agreed with Dr. Wolf–Mehlman's conclusions regarding Leary's personality, in particular, that she is "emotionally volatile." In doing so, the judge relied on the opinions of non-testifying experts as supporting Dr. Wolf–Mehl-

man. Because Dr. Wolf–Mehlman based her conclusions regarding psychometric testing almost exclusively on her conversations with Dr. Dyer, the trial court sustained a hearsay objection. In ruling, however, the court went on to recount what Dr. Dyer had said to Dr. Wolf–Mehlman, word for word, as if it was Dr. Wolf–Mehlman's own opinion.

The trial court also rejected Leary's reasons for the intended relocation, not because they were not made in "good faith," but because they were "not valid" and concluded that, under the circumstances, Morgan's relationship with his daughters could not "be fully sustained through a new visitation scheme," and, accordingly, "the move would be inimical to the girls' interests." It further determined that Leary "is simply too emotionally unstable, based on her history and her test results, to take these children away from their father to a distant state." Rather, the parties' "personalities complement one other" and the loss of their father's constant presence would lead to "emotional damage" to the children.

Leary appealed the denial of relocation and Morgan cross-appealed on the *de facto* shared custody issue. On April 29, 2010, the Appellate Division reversed, permitting Leary to relocate. In ruling, the panel concluded that on the record before it, Leary was the primary caretaker of the children; that she had clearly established good faith reasons for the move; and that there was insufficient evidence to support Morgan's claim that the move would harm the children. The panel declared that the trial court had erred in several ways: (1) by failing to apply the good faith test of *Baures* in favor of a "validity" test regarding Leary's proffered reasons for the move; (2) by failing to recognize that the evidence was sufficient to support a finding of good faith under the proper test; (3) by relying on inadmissible evidence to prove that Leary was emotionally unstable; (4) by concluding that nothing, other than an identical parenting schedule, could sustain Morgan's bond with the girls; and (5) by failing to recognize that Leary established a prima facie case for relocation and that Morgan was

thus required to produce sufficient evidence rebutting that showing, but failed to do so. Accordingly, the panel reversed the denial of Leary's cross-motion and remanded "for the sole purpose of fine tuning the logistics of the visitation and communication schedule."

On May 10, 2010, Morgan filed a motion for reconsideration. Included was information that Leary's engagement to Mambro had ended. The motion was denied. Thereafter, the parties submitted visitation proposals consistent with the remand order. Ultimately, the trial court entered an order detailing a "visitation and communication plan" based on Leary's proposal and Dr. Rosenberg's report.

On June 4, 2010, Morgan petitioned this Court for certification and later moved before the Appellate Division for a stay. Leary opposed the stay motion, which was denied on July 14, 2010. In ruling, the appellate panel stated that Leary's "relationship with Mr. Mambro was only part of [the panel's] consideration." Morgan then sought a stay from this Court, which was granted on July 23, 2010.

Thereafter, we granted Morgan's petition for certification, *Morgan v. Morgan*, 203 *N.J.* 437, 3 *A.*3d 1226 (2010), and ordered accelerated consideration of the matter.

## II.

Morgan argues that he and Leary shared *de facto* custody of the girls and that the courts below erred in ruling otherwise without a plenary hearing specifically addressing that subject; that he established Leary's move would harm the children; and that, in no event should Leary now be permitted to move without a full hearing on presently existing circumstances.

Leary counters that she is the girls' custodial parent and the primary caretaker; that she satisfied the removal standards set forth in *Baures;* and that she should be permitted to move forthwith.

## III.

■■■ An analysis of New Jersey's removal scheme begins with *N.J.S.A.* 9:2–2:

> When the Superior Court has jurisdiction over the custody and maintenance of the minor children of parents divorced, separated or living separate, and such children are natives of this State, or have resided five years within its limits, they shall not be removed out of its jurisdiction against their own consent, if of suitable age to signify the same, nor while under that age without the consent of both parents, unless the court, upon cause shown, shall otherwise order.

The purpose underlying *N.J.S.A.* 9:2–2 is:

> to preserve the rights of the noncustodial parent and the child to maintain and develop their familial relationship. This mutual right of the child and the noncustodial parent to develop and maintain their familial relationship is usually achieved by means of visitation between them. Because the removal of the child from the state may seriously affect the visitation rights of the noncustodial parent, the statute requires the custodial parent to show cause why the move should be permitted.
>
> [*Cooper, supra,* 99 *N.J.* at 50–51, 491 *A.*2d 606.]

That purpose must be effectuated within the realities of post-divorce life:

> [T]he family unity which is lost as a consequence of the divorce is lost irrevocably, and there is no point in judicial insistence on maintaining a wholly unrealistic simulation of unity. The realities of the situation after divorce compel the realization that the child's quality of life and style of life are provided by the custodial parent. That the interests of the child are closely interwoven with those of the custodial parent is consistent with psychological studies of children of divorced or separated parents.
>
> [*Id.* at 53–54, 491 *A.*2d 606 (citation and internal quotation marks omitted).]

Historically, relocation was not looked upon favorably by our courts. *See Baures, supra,* 167 *N.J.* at 105, 770 *A.*2d 214. That disfavor was reflected in our early forays into the subject. For example, in *Cooper* we held that:

> When removal is challenged under *N.J.S.A.* 9:2–2, we hold that to establish sufficient cause for the removal, *the custodial parent initially must show that there is a real advantage to that parent in the move* and that the move is not inimical to the best interests of the children.... It is only after the custodial parent establishes these threshold requirements that the court should consider, based on evidence presented by both parties, visitation and other factors to determine whether the custodial parent has sufficient cause to permit removal under the statute.
>
> [*Cooper, supra,* 99 *N.J.* at 56, 491 *A.*2d 606 (footnote omitted) (emphasis added).]

Over time, there has been a shift in relocation law across the country. That shift has resulted from several factors: the mobility of the population, *Baures, supra,* 167 *N.J.* at 105, 770 *A.*2d 214, advances in technology, *ibid.,* the notion that what is good for the custodial parent is good for the children of the divorce, *id.* at 106, 770 *A.*2d 214; *Cooper, supra,* 99 *N.J.* at 53–54, 491 *A.*2d 606, and a renewed recognition that "[t]he custodial parent who bears the burden and responsibility for the child is entitled, to the greatest possible extent, to the same freedom to seek a better life for herself or himself and the children as enjoyed by the noncustodial parent," *Cooper, supra,* 99 *N.J.* at 55, 491 *A.*2d 606.

Thus, in *Holder,* where .we addressed the liberty interests of custodial parents and the fundamental inequity that emerges out of a scheme that holds a custodial parent hostage in this state while allowing a noncustodial parent complete freedom of movement, we said:

> As men and women approach parity, the question arises when a custodial mother wants to move from one state to another, why not? Until today, our response has included the requirement that the custodial parent establish, among other things, a real advantage to that parent from the move. *Cooper v. Cooper,* 99 *N.J.* 42, 56 [491 *A.*2d 606] (1984). We now modify that requirement and hold that a custodial parent may move with the children of the marriage to another state as long as the move does not interfere with the best interests of the children or the visitation rights of the noncustodial parent.
>
> [*Holder, supra,* 111 *N.J.* at 349, 544 *A.*2d 852.]

## IV.

Because the case law following *Holder* was in disarray regarding the initial burden of proof, the burden of going forward, the ultimate burden of proof, and the elements to be considered in determining whether the move would be "inimical" to the interests of the child, *see Baures, supra,* 167 *N.J.* at 113, 770 *A.*2d 214, we detailed the proper approach in *Baures.*

There, the parties disagreed over whether the wife, who was the primary custodial parent, could move to Wisconsin, her home state, with their son who suffered a disorder on the autism spectrum. *Id.* at 98–99, 770 *A.*2d 214. The wife sought to move to

be closer to her parents, an arrangement she argued would provide her with needed support and assistance. *Id.* at 99, 770 A.2d 214. Though the parties had discussed such a relocation following the husband's anticipated military discharge, they experienced marital difficulties, culminating in an eventual separation. *Id.* at 98–99, 770 A.2d 214. The husband moved for custody because he believed that his wife was going to remove the child to Wisconsin. *Id.* at 99, 770 A.2d 214. The wife filed for divorce and later amended her complaint to include a removal request. *Ibid.* After a hearing, the trial court denied the removal motion. *Id.* at 102, 770 A.2d 214. Although the wife proved a good faith reason for the relocation—"financial and emotional stability and caregiving by her parents"—the trial court held she had not met the second prong, which focused on the interests of the child. *Ibid.* Specifically, the trial court determined the move would harm the father's relationship with his son and that the mother's evidence regarding equivalent or better special education was insufficient. *Ibid.* On reconsideration, the trial court ordered an expert evaluation, heard evidence on the father's job opportunities in Wisconsin, and ultimately affirmed its initial order. *Id.* at 102–04, 770 A.2d 214. The Appellate Division affirmed. *Id.* at 105, 770 A.2d 214.

We reversed and remanded for further proceedings and, in doing so, restated our view that in a removal case the movant must prove "a good faith reason for the move and that the child will not suffer from it." *Id.* at 118, 122–23, 770 A.2d 214. To assist in that analysis, we set forth a twelve-factor metric for deciding whether removal is warranted under that two-part test:

(1) the reasons given for the move; (2) the reasons given for the opposition; (3) the past history of dealings between the parties insofar as it bears on the reasons advanced by both parties for supporting and opposing the move; (4) whether the child will receive educational, health and leisure opportunities at least equal to what is available here; (5) any special needs or talents of the child that require accommodation and whether such accommodation or its equivalent is available in the new location; (6) whether a visitation and communication schedule can be developed that will allow the noncustodial parent to maintain a full and continuous relationship with the child; (7) the likelihood that the custodial parent will continue to foster the child's relationship with the noncustodial parent if the move is allowed; (8) the effect of the move on extended family relationships here and in the new

location; (9) if the child is of age, his or her preference; (10) whether the child is entering his or her senior year in high school at which point he or she should generally not be moved until graduation without his or her consent; (11) whether the noncustodial parent has the ability to relocate; (12) any other factor bearing on the child's interest.

[*Id.* at 116–17, 770 *A*.2d 214.]

Obviously, not all factors will apply in every case and, to the extent that factors are applicable, all may not have equal relevance. *Id.* at 117, 770 *A*.2d 214.

█ We also made clear in *Baures* that a mere change in parenting time would not be sufficient to bar a move. *Id.* at 113, 117, 770 *A*.2d 214. Indeed, as we had said in *Cooper*, the advantages of the move should not be sacrificed solely to maintain the "same" visitation schedule where a reasonable alternative visitation scheme is available. *Cooper, supra,* 99 *N.J.* at 57–58, 491 *A*.2d 606.

█ Procedurally, the first step of the removal test considers the type of parenting arrangement between the parties and whether the matter is actually an application for a change in custody as opposed to a removal case. For example, a removal motion by a party in a case where the children rotate between houses, with each parent assuming full parental responsibility half of the time, is clearly an application to change the custodial status which cannot be maintained from a distance. In contrast, an application by a custodial parent to move away in a case in which the noncustodial parent sees the children once or twice a week and is not seeking to change that state of affairs, is a removal motion. The possible scenarios are limitless; whether the motion should be viewed through the *Baures* prism or as one for custody will depend on the facts.

█ The distinction between custody and removal is important in terms of the burden of proof. A custody case is squarely dependent on what is in the child's best interests. *N.J.S.A.* 9:2–4; *see Baures, supra,* 167 *N.J.* at 115, 770 *A*.2d 214; *Kinsella v. Kinsella,* 150 *N.J.* 276, 317, 696 *A*.2d 556 (1997); *Fantony v.*

*Fantony,* 21 *N.J.* 525, 536, 122 *A.2d* 593 (1956). In a removal case,

> the parents' interests take on importance. However, although the parties often do not seem to realize it, the conflict in a removal case is not purely between the parents' needs and desires. Rather, it is a conflict based on the extent to which those needs and desires can be viewed as intertwined with the child's interests. *Cooper,* and more particularly, *Holder,* recognize that subtlety by according special respect to the liberty interests of the custodial parent to seek happiness and fulfillment because that parent's happiness and fulfillment enure to the child's benefit in the new family unit. At the same time those cases underscore the importance of the child's relationship with the noncustodial parent and require a visitation schedule sufficient to support and nurture that relationship. The critical path to a removal disposition therefore is not necessarily the one that satisfies one parent or even splits the difference between the parents, but the one that will not cause detriment to the child.
>
> [*Baures, supra,* 167 *N.J.* at 115–116, 770 *A.2d* 214; *see also O'Connor v. O'Connor,* 349 *N.J.Super.* 381, 385, 400, 793 *A.2d* 810 (App.Div.2002) (recognizing threshold question and articulating time- and responsibilities-based test for evaluating type of parenting arrangement); *Mamolen v. Mamolen,* 346 *N.J.Super.* 493, 502, 788 *A.2d* 795 (App.Div.2002) (noting importance of "nature of the relationship" between the parents in this regard).]

The harm standard, which is deeply rooted in our removal jurisprudence, is necessary in a traditional removal setting because of the real-life consequences of the application of a pure best-interests standard. Practically speaking, that standard would always, or nearly always, break in favor of keeping the child in proximity to two fit parents, thus chaining the custodial parent, who bears the laboring oar in child rearing, to New Jersey, while permitting the noncustodial parent free movement. It was that scenario that *Cooper, Holder,* and *Baures* recognized and addressed, prioritizing the right of the custodial parent to self-determination by permitting a good faith move that is not inimical to the child's interest. There is no need for such prioritization where the parties equally share in the daily burdens of child rearing.

Once the parties' status is determined and the case is denominated as one involving removal, the burden of production rests initially on the movant to make out a prima facie showing on the good faith and harm to the child prongs, which typically

requires a "visitation proposal." *Baures, supra,* 167 *N.J.* at 118, 770 *A.*2d 214. That burden "is not a particularly onerous one":

> It will be met, for example, by a custodial parent who shows that he is seeking to move closer to a large extended family that can help him raise his child; that the child will have educational, health and leisure opportunities at least equal to that which is available here, and that he has thought out a visitation schedule that will allow the child to maintain his or her relationship with the noncustodial parent. [*Ibid.*]

Should the moving party meet the burden of production, the noncustodial parent must then "produce evidence opposing the move as either not in good faith or inimical to the child's interest." *Id.* at 119, 770 *A.*2d 214. Problems, in the form of detriment to the child, with regard to changed visitation may prove particularly important. *Ibid.* Further:

> Although children are generally resilient and can adapt to removal so long as their relationship with the noncustodial parent is fully sustained through a new visitation scheme, the noncustodial parent remains free to adduce evidence that for particular reasons, and in light of the unique facts surrounding his or her relationship with the child, such a conclusion should not be drawn. The possible evidential proffers in a case like this are as varied as human nature itself. [*Id.* at 120, 770 *A.*2d 214.]

Once that evidence is produced, the custodial parent may adduce further evidence or may rest. *Ibid.* Either way, the ultimate burden of proving both good faith and that the children will not be harmed by the move remains with the party seeking to relocate. That is the backdrop for our inquiry.

## V.

▮▮▮ We turn first to Morgan's contention that he and Leary shared custody *de facto* and that, at the very least, he was entitled to a plenary hearing on the subject. The point of that claim is to change the standard under which Leary's motion to move to Massachusetts is reviewed, by casting the issue as one of custody, rather than removal. Neither the trial court nor the Appellate Division was persuaded by Morgan's argument. Nor are we.

▮▮▮ Shared physical custody is, as the Appellate Division observed, "a rare occurrence." What is critical to such an analysis

is "each party's responsibility for the custodial functions, responsibilities and duties normally reposed in the primary caretaker." *O'Connor, supra,* 349 *N.J.Super.* at 400, 793 *A.*2d 810 (citing *Pascale, supra,* 140 *N.J.* at 598–99, 660 *A.*2d 485); *see also Pascale, supra,* 140 *N.J.* at 596–600, 660 *A.*2d 485 (defining "joint physical custody" and primary/secondary caretaker terminology). Relevant considerations include:

> preparing and planning of meals; bathing, grooming, and dressing; purchasing, cleaning, and caring for clothes; medical care, including nursing and general trips to physicians; arranging for social interaction among peers; arranging alternative care, i.e., babysitting or daycare; putting child to bed at night, attending to child in the middle of the night, and waking child in the morning; disciplining; and educating the child in a religious or cultural manner.
>
> [*Pascale, supra,* 140 *N.J.* at 598–99, 660 *A.*2d 485.]

Morgan's claim here is based on the fact that he "saw" the girls more than the PSA provided and was involved in their school and sports life. Even if credited, those facts fail to satisfy the *Pascale* standard. *De facto* shared custody does not arise out of "[n]umerous 'parenting times' with a child." *Id.* at 597, 660 *A.*2d 485. It is the nature of the interactions and not their number that tells the tale.

We are satisfied, as were the courts below, that Morgan did not make out a case of changed circumstances and that the facts alleged, even if proved, were insufficient to establish a *de facto* shared custody arrangement, thus obviating the need for a plenary hearing on that subject.

## VI.

Obviously, that is not to suggest that Morgan's constant presence in the girls' lives is not relevant. To the contrary, it constitutes an important weight in the *Baures* calculus, to which we now turn.

The Appellate Division concluded that the trial court made several significant errors in its *Baures* analysis, requiring reversal of the order denying removal. In particular, the appellate panel found that the trial court erred in: (1) failing to apply the "good

faith" standard of *Baures*; (2) failing to recognize that that standard was satisfied; and (3) concluding that Leary's "emotional instability" was supported by admissible evidence in the record.

We have carefully reviewed this record in light of the appropriate legal standards and have determined that those conclusions are unassailable. Indeed, although the trial court properly credited the importance of Morgan's role in the girls' lives, it did not apply the good faith standard; did not recognize that that standard was satisfied by the reasons Leary advanced for the move; and permitted evidence of non-testifying experts it had previously ruled inadmissible to affect its judgment regarding Leary's mental state. Whether the Appellate Division should have entered an order of its own permitting Leary to move, or remanded the matter to the trial court to decide the case anew under the correct legal standards, is debatable. However, we need not join that debate because at this point, a full remand is in order.

Four years have elapsed since the evidence was adduced before the trial court. Enormous changes in the parties' lives have occurred. Leary's engagement is off. Mambro will not be supporting the family and Leary will not be a stay-at-home mother. Thus, two of the three pediments on which Leary's proposal to move was based no longer exist. Further, the girls are now twelve and nine, respectively. Anna has a legal right to express a preference regarding the move. *N.J.S.A.* 9:2–2; *Baures, supra*, 167 *N.J.* at 117, 770 *A.*2d 214. Both girls are likely more fully ensconced in school, extra-curricular activities, and in community life with family and friends. Morgan has remarried and now has a son—the girls' new half-brother. Moreover, by this time we assume that the parties' participation in the children's day-to-day lives has reached an angle of repose, the precise details of which are not before us. Under the circumstances, a remand that does not take those changes into account is inadequate.

Indeed, there is abundant support for the proposition that a remand in a removal case should be sufficiently broad in scope to permit consideration of the "living record." *Holder, supra*, 111

*N.J.* at 354, 544 *A.*2d 852. As we noted in *Baures,* "with the passage of time, the evidence adduced in the earlier proceedings may have changed." *Baures, supra,* 167 *N.J.* at 120, 770 *A.*2d 214. Likewise, in *Cooper,* where we remanded for consideration under a new rule of law, we permitted the parties to present new evidence:

> Since we recognize that the circumstances of the parties have changed in the year that has elapsed since the original hearing on this motion, on remand both parties may supplement the record with any information that may be pertinent to the trial judge's determination of this case.

> [*Cooper, supra,* 99 *N.J.* at 58–59, 491 *A.*2d 606; *see also Horswell v. Horswell,* 297 *N.J.Super.* 94, 104, 687 *A.*2d 797 (App.Div.1997) (holding in remanded relocation case, court should consider children's present circumstances); *Mamolen, supra,* 346 *N.J.Super.* at 504, 788 *A.*2d 795 (remanding for "reconsider[ation of] the evidence that was previously adduced and to also provide the parties with the opportunity to submit such additional evidence as may be warranted in light of our opinion and in light of the passage of time").]

That is not to suggest that the ticking clock alone will justify a reversal and a full remand in every case. To the contrary, it is the substantive changes in the parties' lives that take place during the passage of time that are the focus. Each case is fact sensitive. On the facts before us, so many dramatic changes have occurred that the broader remedy is justified.[3] At the hearing, all of the *Baures* factors that are relevant should be addressed and updated psychological evaluations should be ordered, if appropriate. The hearing should take place expeditiously.

## VII.

The judgment of the Appellate Division is affirmed and modified. We affirm the court's conclusion that Morgan did not establish *de facto* shared custody and that the trial court's prohibition against relocation required reversal. We also affirm the order of remand, but modify the scope of the remand order to

---

[3] If Morgan has new evidence bearing on the actual custodial status quo, he may pursue his *de facto* shared custody claim or the hearing.

account for present circumstances in accordance with the principles to which we have adverted.

*For affirmance and modification*—Justices LONG, LaVECCHIA, ALBIN, RIVERA–SOTO, HOENS and STERN (temporarily assigned)—6.

*Opposed*—None.

*Not Participating*—Chief Justice RABNER—1.

