NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2083-12T1

S.B.,

        Plaintiff-Appellant,

   v.

G.M.B., now known as G.M.P.,

        Defendant-Respondent.

_____

APPROVED FOR PUBLICATION

February 19, 2014

APPELLATE DIVISION

Submitted January 7, 2014 — Decided February 19, 2014

Before Judges Fisher, Koblitz and O'Connor.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FM-12-2556-11E.

Goldstein, Bachman & Newman, P.A., attorneys for appellant (Regan A. Stempniewicz, on the brief).

G.M.P., respondent, pro se.

The opinion of the court was delivered by

FISHER, P.J.A.D.

In this appeal, we consider whether the trial judge erred in applying New Jersey's version of the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA)[1] in declining

_____

[1] N.J.S.A. 2A:34-53 to -95.

jurisdiction and finding Canada to be a more appropriate forum for the parties' parenting-time dispute. Because it has not been shown that plaintiff will likely be able to enter Canada due to his criminal conviction for an assault on defendant, and because the parties' property settlement agreement (PSA), which was executed a few months earlier, clearly and unambiguously stipulated that New Jersey would continue to be the exclusive jurisdiction for parenting-time disputes, we conclude that the judge misapplied N.J.S.A. 2A:34-71.

I

In May 2011, defendant G.M.P. (Glenda) filed a domestic violence action and, on June 14, 2012, obtained a final restraining order (FRO) against her husband of ten years, plaintiff S.B. (Stephen).[2] Stephen pleaded guilty to a third-degree offense with regard to the event that gave rise to the FRO. On July 13, 2012, Stephen began a three-year probationary term.

On May 3, 2012, the marriage was dissolved by way of a dual judgment of divorce, which incorporated the parties' PSA. The parties have four children, and the PSA stipulated that Glenda could remove the minor children from New Jersey to Brighton,

---

[2] The names we have assigned to the parties are fictitious.

A-2083-12T1

Ontario, Canada. Stephen's consent to removal was conditioned on Glenda's "express[ed] and irrevocabl[e] consent[]" that, until their youngest child was emancipated, New Jersey would "retain continuing exclusive jurisdiction over all matters and proceedings pertaining to child custody, child support, and parenting time." She also agreed: that any orders regarding custody, support or parenting time entered by our courts would "supersede any such orders entered in Canada and shall have and be given full force and effect in Canada"; that by entering into the PSA, she "expressly and irrevocably assent[ed] and submit[ted]" to personal jurisdiction in our courts; that she "irrevocably consent[ed]" to receiving service of any pleadings at her residence in Canada; and that she "expressly and irrevocably waive[d] any claim or defense of improper service, lack of personal jurisdiction, improper venue or forum non conveniens or any similar basis."

Glenda moved with the children to Canada, on August 2, 2012. On or about September 13, 2012, slightly more than one month later and a mere four months after the PSA's execution, Stephen moved in the trial court, asserting that Glenda had failed to provide him with parenting time over the Labor Day weekend. In considering the motion, and notwithstanding the parties' stipulation in their PSA that the trial court would

retain jurisdiction over custody and visitation issues, the motion judge advised the parties that, in the judge's words, he would "sua sponte [consider] whether Ontario was a more appropriate forum under N.J.S.A. 2A:34-71 as interpreted" by Griffith v. Tressel, 394 N.J. Super. 128 (App. Div. 2007). For reasons expressed in a written opinion, the judge found New Jersey was "an inconvenient forum within the meaning of N.J.S.A. 2A:34-71 and that it is appropriate for Ontario to exercise jurisdiction."

In moving for enforcement of the PSA's parenting-time provisions, Stephen argued that the designation of Canada as the location for the exercise of some of Stephen's parenting time was no longer feasible because his criminal conviction barred his entry into Canada. This possibility was anticipated in the PSA, which stated that:

> If, for any reason, the Husband is refused entry into Canada and prevented from exercising the parenting time set forth in subparagraphs (h) through (j) above,[3] the

---

[3]The PSA delineated Stephen's parenting time with the children in great detail. Among other things, subparagraph (d) stipulated he would have extended visitation with the children in New Jersey for a seven-week period. Subparagraph (f) permitted Stephen visitation with the children in New Jersey every "American Thanksgiving weekend" and for their spring breaks from school. And subparagraph (g) called for the parties to alternate each year having the children at Christmas time. Subparagraphs (h) and (i) provided Stephen with additional time with the children on Father's Day weekend, the weekend of

(continued)

> parties shall agree on reasonable equivalent parenting time for the Husband at an agreed upon location in the United States. The parties reserve the right to apply to the [c]ourt for a determination of this issue in the event that they cannot reach an agreement.

In light of this provision and his assertion he would not be able to cross the border into Canada, Stephen sought an order requiring that Glenda bring the children to Cortland, New York, approximately halfway between Glenda's residence in Canada and Stephen's in New Jersey for the Canadian parenting time referred to in the PSA.

Although she opposed the awarding of any relief — in fact, Glenda chiefly argued that parenting time should be suspended pending a psychological evaluation of Stephen — Glenda did not argue for a Canadian forum. Whether the forum should be changed was a matter unilaterally raised by the judge. After requesting additional submissions on that topic, the trial judge held, without conducting an evidentiary hearing, that a consideration of the factors outlined in N.J.S.A. 2A:34-71 compelled a

_____

(continued)
Stephen's birthday, and the children's birthdays, in Canada. Subparagraph (j) afforded Stephen the right to overnight parenting time with the children in Canada one weekend "in each of the months during which he would otherwise not see them."

A-2083-12T1

declination of jurisdiction in favor of Canadian proceedings.[4] The November 28, 2012 order in question was stayed by the judge for forty-five days pending the filing of a suit in Canada. The judge also ruled on a number of ancillary monetary issues.

## II

## A

In considering the judge's declination of jurisdiction, the first question to be considered "is whether this state acquired 'exclusive, continuing jurisdiction' over custody determinations involving th[e] family when the initial order was entered." Griffith, supra, 394 N.J. Super. at 139 (internal citations omitted). There is no question that that is so; the parties and children resided in New Jersey when the judgment defining the custody and parenting issues was entered by the trial court.

The next question concerns "whether, during the time between the initial order and the filing of the motion for modification, circumstances have changed so as to divest this state of that jurisdiction." Id. at 140. Certainly, there have been changes; with Stephen's consent, the children have moved to Canada with their mother. But there is no question that New Jersey has not lost jurisdiction based on a lack of a

---

[4]There were no proceedings pending in Canada at that time.

"significant connection" or "substantial evidence." See N.J.S.A. 2A:34-66(a)(1); Griffith, supra, 394 N.J. Super. at 142-45. Because the move to Canada occurred only a few months before the PSA was executed, and because Stephen remains a New Jersey resident and is still entitled to meaningful parenting time with the children in New Jersey, there is no doubt New Jersey has not lost jurisdiction over parenting-time controversies. Indeed, as our Supreme Court has recognized, New Jersey "'will continue to have modification jurisdiction until it loses all or almost all connection with the child.'" Neger v. Neger, 93 N.J. 15, 30 (1983) (quoting Kumar v. Superior Court, 652 P.2d 1003, 1009-10 (Cal. 1982)).

Here, the trial judge did not find a loss of jurisdiction. Instead, in relying on N.J.S.A. 2A:34-71, the judge determined that in these circumstances New Jersey should decline jurisdiction in favor of Canada. That determination requires a consideration of whether "'the court of another State[5] is in a better position to make the custody determination, taking into consideration the relative circumstances of the parties.'" Griffith, supra, 394 N.J. Super. at 148 (quoting UCCJEA § 207).

---

[5]In this context, Canada is considered to be another state. See N.J.S.A. 2A:34-57(a).

N.J.S.A. 2A:34-71(b) provides eight factors a court must consider in making such a determination. Before turning to the application of those factors here, however, we must recognize that what is being considered is whether the home state "is an inconvenient forum under the circumstances and [whether] a court of another state is a more appropriate forum." N.J.S.A. 2A:34-71(a). In short, to decline jurisdiction, the trial judge was required not only to accurately determine that New Jersey constitutes "an inconvenient forum" but also that Canada represents "a more appropriate forum"; the statute joins those two concepts with the word "and," and so both elements must be found before the home state may decline jurisdiction.

B

We turn first to the latter question — whether Canada is a more appropriate forum — because that question is dispositive. The record does not permit a finding that Canada is "an appropriate forum," let alone "a more appropriate forum."

Stephen presented a certification that explained how he traveled to a border crossing in upstate New York and was denied entry because of his criminal record. The trial judge assumed this event actually occurred, but found that circumstance irrelevant because of the judge's belief that — even though Canadian law may, as a general matter, bar Stephen's entry due

to his criminal record — Canadian immigration officials may make exceptions and grant a temporary visa of limited duration and scope. In short, the judge rejected Stephen's contention that Canadian law "absolute[ly]" bars his entry, and he found that Canadian law provides the discretion to permit entry.

Neither party has briefed Canadian law on this subject. The judge referred to one statutory provision and a related regulation in support of his belief that Stephen might be able to secure entry into Canada to appear in its courts for a limited purpose. Although a judge may take judicial notice of foreign law, N.J.R.E. 201(a), we are not satisfied from the limited state of the record in this regard that obtaining of admission into Canada is as readily available as the judge suggests. Moreover, the judge's interpretation of the provisions he cited recognizes that, at the very least, Stephen would be relegated to an application process, and perhaps additional litigation, just to obtain the right to enter Canada. And, of course, because entry into Canada, if at all permitted, would undoubtedly rest in the discretion of Canadian officials, Stephen may very well — at the conclusion of any such proceedings — ultimately be denied access. In short, as the trial judge recognized, until Stephen takes those steps "it is premature at best to assume [he] would be denied entry" for

purposes of litigating his parenting-time dispute with Glenda. By the same token, it is premature to assume he will be permitted entry. The judge, however, also had an answer for this: "Even if [Stephen] is ultimately denied entry to Canada he can still participate by video conferencing that will allow him to have full access to the courtroom." The judge cited no Canadian statute, rule or case law to support the conclusion that Stephen would be permitted to participate in a Canadian proceeding in this matter, let alone whether such a process would constitute an adequate substitute for his physical presence in the forum.

Moreover, Stephen's probation officer testified that someone in Stephen's position would normally be barred from leaving the United States, although he recognized a court could allow him to leave for a specific purpose such as appearing in a foreign court. The judge made no determination nor expressed any opinion on the likelihood of Stephen obtaining such an order. In short, as matters presently stand, there is no guarantee that Stephen will either be permitted to leave New Jersey or enter Canada for the proceedings to which the trial judge relegated him.

As a result, we conclude that the record does not support a finding that Canada constitutes "an appropriate forum," let

10

alone "a more appropriate forum" than New Jersey. Multiple obstacles stand in the way of Canada constituting an adequate forum for the resolution of the parties' disputes.

The language of the applicable statute is couched in terms similar to those used to describe the doctrine of forum non conveniens, requiring that the current forum be "inconvenient" and the other forum "appropriate." Compare D'Agostino v. Johnson & Johnson, Inc., 225 N.J. Super. 250, 259 (App. Div. 1988), aff'd, 115 N.J. 491 (1989) (describing "the essence of the doctrine" of forum non conveniens as allowing a court to "decline jurisdiction whenever the ends of justice" demonstrate the chosen forum "would be inappropriate") with N.J.S.A. 2A:34-71(b) (requiring that "[b]efore determining whether it is an inconvenient forum, a court of this State shall consider whether it is appropriate for a court of another state to exercise jurisdiction"). The adoption of language used by courts in describing the doctrine of forum non conveniens strongly suggests the Legislature sought our similar approach when applying N.J.S.A. 2A:34-71.

The doctrine of forum non conveniens, to which we look for additional guidance, is "equitable in nature," Kurzke v. Nissan Motor Corp., 164 N.J. 159, 165 (2000), "a manifestation of a 'civilized judicial system,'" ibid. (quoting Baltimore & Ohio

R.R. Co. v. Kepner, 314 U.S. 44, 55, 62 S. Ct. 6, 11, 86 L. Ed. 28, 34 (1941)). We find the trial judge's declination of jurisdiction to be highly inequitable because it relegates Stephen to an attempt to litigate his parenting-time issues in a forum that may not be accessible, instead of in a jurisdiction the parties expressly and unequivocally stipulated as the forum for such disputes — a forum that unquestionably possesses jurisdiction over the disputes. Because Canada has not been shown to be an "appropriate" forum, we reverse.

C

Although not necessary to our disposition of this appeal, we also reject the judge's conclusion that — even if Canada was an appropriate forum — the eight factors set forth in N.J.S.A. 2A:34-71(b) support the declination of jurisdiction.

The first factor requires consideration of "whether domestic violence has occurred and is likely to continue in the future and which state could best protect the parties and the child." N.J.S.A. 2A:34-71(b)(1). The judge recognized that our courts granted Glenda an FRO and Stephen is serving a probationary term here that arises from his conviction for the same incident. The judge also found both New Jersey and Canada law provide a comprehensive array of services for domestic violence victims. The judge, however, seems to place this

12                                                              A-2083-12T1

factor in favor of a Canadian forum simply because Glenda and the children now reside there. And the judge gave no weight to the fact that Glenda stipulated to a New Jersey forum after the FRO was entered, after defendant pleaded guilty to a criminal offense, and after Glenda formulated plans to move to Canada, or the fact that there has been no domestic violence since the FRO was granted.

The second factor requires consideration of "the length of time the child[ren] ha[ve] resided outside this State." N.J.S.A. 2A:34-71(b)(2). New Jersey was home to Glenda and the children throughout the marriage; their four children, who were, at the time of the entry of the order in question, eleven, eight, seven, and four years old, were born and raised here until Glenda's move to Canada in August 2012, only one month prior to the filing of Stephen's motion. Although the judge seems to have concluded this factor favors a Canadian forum, he did so by mistakenly transforming this second factor into the sixth factor, which requires consideration of "the nature and location of the evidence required to resolve the pending litigation, including the testimony of the child[ren]," N.J.S.A. 2A:34-71(b)(6), by stating: "the issues regarding parenting that have been raised by this motion and cross-motion relate to the current condition of the children and most of that evidence

and the witnesses needed to present it are in Ontario." The judge's interpretation of the second factor was erroneous. The second factor relates only to the amount of time the children have lived outside New Jersey. The simple answer is approximately one month.[6] This factor highly favors New Jersey's retention of jurisdiction.

The third factor requires consideration of "the distance between the court in this State and the court in the state that would assume jurisdiction." N.J.S.A. 2A:34-71(b)(3). The judge found that the distance between Glenda's current home and Middlesex County is approximately 450 miles. In finding this factor weighed in favor of a Canadian forum, the judge focused on a New Jersey court's apparent inability to compel production of records or witnesses. Again, the judge erroneously transmogrified this factor into the sixth factor. Instead, the third factor requires recognition that a Canadian forum is more convenient for Glenda and a New Jersey forum is more convenient for Stephen.

The fourth factor requires consideration of "the relative financial circumstances of the parties." N.J.S.A. 2A:34-

---

[6]The record suggests that Glenda and the children moved to Canada on August 2, 2012. After Stephen was allegedly deprived of parenting time on the Labor Day weekend, he filed his motion on or about September 13, 2012.

71(b)(4). The judge found that the parties' most recent case information statements revealed that Stephen had an annual income slightly in excess of $100,000, and Glenda's annual income was less than $10,000. Even with the payment by Stephen to Glenda of $25,800 per year in alimony, there remained a significant gulf between the parties' incomes that does, as the judge held, favor a forum closer to Glenda's home.

The fifth factor requires consideration of "any agreement of the parties as to which state should assume jurisdiction." N.J.S.A. 2A:34-71(b)(5). There is no question the parties unambiguously agreed that New Jersey would remain the exclusive jurisdiction for the resolution of their disputes. Indeed, the PSA expresses that Stephen surrendered his statutory right to object to the removal of the children from the jurisdiction, N.J.S.A. 9:2-2, in exchange for Glenda's agreement that New Jersey would remain the forum for all their parenting-time disputes until emancipation of the youngest child. The judge's statement that the parties' agreement is not binding suggests he gave it little weight.[7] The judge was greatly mistaken in this regard. The parties stipulated to the continuation of New

---

[7]After recognizing the parties' unequivocal agreement in this regard, the judge concluded that "[u]nder the facts of this case the jurisdictional provisions of the [PSA] must yield to other more compelling concerns."

Jersey as the forum for any disputes. Glenda received valuable consideration in obtaining Stephen's consent to her removal of the children from New Jersey; she gained certainty and the elimination of the possibility of Stephen's opposition to removal and the subsequent litigation — in New Jersey — that would have likely followed.[8] The judge erred in giving this factor little or no weight.

As mentioned earlier, the sixth factor involves consideration of "the nature and location of the evidence required to resolve the pending litigation, including the testimony of the child[ren]." N.J.S.A. 2A:34-71(b)(6). The judge spent a good deal of his opinion expressing a concern about Canadian evidence being inaccessible to a New Jersey court. What has been overlooked, however, is that the current dispute mainly concerns the pursuit of an alternative to the PSA's declaration of Stephen's right to visitation at times in Canada.

Although Stephen is entitled to considerable visitation in New Jersey in the summer and at other times, subparagraphs (h)

---

[8]Litigation of such questions are frequently protracted and often present "difficult and often heart-wrenching decisions." Morgan v. Morgan, 205 N.J. 50, 54 (2011); see also Baures v. Lewis, 167 N.J. 91, 97 (2001) (recognizing there is "rarely an easy answer or even an entirely satisfactory one" when a parent objects to a child's removal from the jurisdiction).

and (i) of the PSA's sixteenth paragraph provide Stephen with additional time with the children on Father's Day weekend, the weekend of Stephen's birthday, and the children's birthdays in Canada. And subparagraph (j) afforded Stephen the right to overnight parenting time with the children in Canada one weekend "in each of the months during which he would otherwise would not see them." It appears that the simple question to be decided is how can the parenting time precluded by Stephen's ostensible inability to enter Canada be equitably replaced. Stephen has suggested that this parenting time occur in Courtland, New York, a town approximately halfway between the parties' residences. Logic suggests that the parties' intent, when they designated these specific parenting times would take place in Canada, would be better redressed by choosing a location in the United States far closer to Canada. In any event, it is not clear to us what Canadian "evidence" would be required to iron out this dispute; indeed, this type of dispute may not even require an evidentiary hearing.

And if we are mistaken, and there is evidence that requires consideration at a plenary hearing, consideration of this factor also requires an examination of the New Jersey evidence a Canadian court would require and the difficulties a Canadian court might encounter when the parties seek production of that

evidence. In addition, the judge who ultimately considers the merits of the parties' dispute might be interested in hearing whatever Stephen's probation officer might have to contribute. As a result, consideration of the sixth factor requires an understanding of the difficulties a Canadian court might encounter in obtaining a New Jersey probation officer's testimony as opposed to its ready availability in New Jersey. Rather than constitute what seems to have been the overriding factor in the judge's decision to decline jurisdiction, this availability-of-evidence factor is at best neutral — both fora would likely encounter similar difficulties in obtaining evidence located in the other — but is likely more favorable to the retention of jurisdiction in New Jersey because the children spent their entire lives here until they moved to Canada approximately one month before the parenting-time issue arose.

The seventh factor requires consideration of "the ability of the court of each state to decide the issue expeditiously and the procedures necessary to present the evidence." N.J.S.A. 2A:34-71(b)(7). The trial judge observed the Canadian courts, like our own, recognize that custody and parenting-time issues are to be decided expeditiously. As a result, such a limited examination of this factor suggests it does not weigh in favor of either position. When viewed more deeply, however, there are

— as we have observed — further obstacles to a Canadian adjudication of the parenting-time dispute. Stephen's attempts to enter Canada will likely be the subject of an application process and perhaps additional litigation if he is denied relief; there is no information in the record to suggest whether he possesses a likelihood of success or how long such a determination may take. On the other hand, we assume the matter could be resolved in our courts expeditiously because there is no impediment to Glenda and the children entering this country for purposes of such a hearing — assuming an evidentiary hearing is even necessary. Although the record is rather barren on the point, experience suggests that, subject to Glenda's convenience, the matter could be disposed of quickly in our courts.

The eighth and final factor requires consideration of "the familiarity of the court of each state with the facts and issues of the pending litigation." N.J.S.A. 2A:34-71(b)(8). The record reveals that no Canadian court is familiar with this case. On the other hand, the trial judge presided over and made findings of fact in the domestic violence matter, and he later presided over the uncontested divorce proceedings; accordingly, our courts are quite familiar with the parties and their past

troubles, whereas the Canadian courts know nothing of these parties.

As can be seen, the second, fifth and eighth factors all favor retention of jurisdiction here in New Jersey. Others, such as the first, third, sixth and seventh are arguably in equipoise, and only the fourth favors a Canadian forum. Accordingly, even if we were to ignore the fact that a Canadian forum is not an appropriate forum because it has not been shown that Stephen can enter Canada, a quantitative consideration of the statutory factors strongly tilt in favor of New Jersey's retention of jurisdiction. Even so, we recognize that simple arithmetic is not what the legislation expects of our courts. A more sophisticated approach requires a consideration — based on the parties' particular circumstances — as to the weight to be given to those in favor of and against a declination of jurisdiction. Clearly those factors that suggest the retention of jurisdiction — particularly the fifth factor (the existence of an agreement on the matter) — should be given greater weight than many of the others in this case. The parties, both then represented by counsel, executed a PSA — a mere four months before problems arose — that specifically stipulated to New Jersey's retention of jurisdiction. Those statutory factors that may suggest New Jersey's declination of jurisdiction or are

20

in equipoise represent only the foreseeable consequences of the parties' free and voluntary agreement and should not have more weight than the agreement itself. When viewed in that context, there are very little, if any, arguable reasons for New Jersey's declination of jurisdiction at this time.

D

For these reasons, we reverse the November 28, 2012 order insofar as it memorializes the judge's decision to decline jurisdiction. The parenting-time issues should be resolved in the trial court as expeditiously as possible. Because of the time that has elapsed since the order was entered, we exercise original jurisdiction to order that any future visitation pursuant to subparagraphs (h) through (j) of paragraph 16 of the PSA occur in Niagara Falls, New York, or such other location on which the parties may mutually agree. Stephen may not transport the children more than thirty miles from that locale on those occasions without Glenda's approval or court order. These conditions shall remain in place until such time as the trial court has an opportunity to hear from the parties on the parenting time issues.

The first seven points of Stephen's appellate brief relate to the trial judge's jurisdictional ruling, which we have reversed. Stephen also argues that the judge's disposition of other issues was erroneous:

> VIII. THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S REQUEST TO SUSPEND ALIMONY AS SPECIFICALLY AGREED TO IN PARTIES['] [PSA] WITHOUT STAYING SAID ISSUE FOR FORTY-FIVE (45) DAYS AS WELL.
>
> IX. THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S REQUEST AS TO CLAIMING THE PARTIES' CHILDREN WITHOUT PROVIDING A REASONING FOR SAME OR STAYING SAID ISSUE FOR FORTY-FIVE (45) DAYS AS WELL.
>
> X. THE TRIAL COURT ERRED IN PARAGRAPH 29 [OF THE NOVEMBER 28, 2012 ORDER] BY ALTERING PARTIES' [PSA] AND ACCELERATING PLAINTIFF'S PAYMENT DUE AND OWING FOR A JUDGMENT FROM 12 MONTHS TO 30 DAYS AND ISSUING A BENCH WARRANT WHILE FAILING TO PROVIDE ANY REASONS ON THE RECORD AS TO SAME.
>
> XI. THE TRIAL COURT ERRED IN PARAGRAPH 25 [OF THE NOVEMBER 28, 2012 ORDER] IN DENYING LEGAL FEES, NOT STAYING THE ISSUE, AND NOT PROVIDING A REASONING OR APPLICATION OF THE RULE 5:3-5(c) AS THE PLAINTIFF FILED IN GOOD FAITH TO ENFORCE PARENTING TIME, WHEREAS THE DEFENDANT'S MOTION SEEKS TO AMEND PARTIES' AGREEMENT AND SUSPEND ALL PARENTING TIME IN BAD FAITH.

We find insufficient merit in Points VIII and IX to warrant discussion in a written opinion, R. 2:11-3(e)(1)(E), adding only the following. With regard to Point VIII, the suspension of

alimony authorized by paragraph 5 of the PSA expressly applies only when there is a "willful failure" by Glenda "to comply with the child custody and parenting time provisions." The confusion regarding parenting time around Labor Day of 2012 was a product of the problem Stephen has in entering Canada and other circumstances that do not remotely suggest Glenda's "willful failure" to abide by the PSA's parenting-time provisions. Stephen's Point IX has no merit because the PSA precisely spells out how the parties will divide the tax exemptions in the future, and Stephen has alluded to nothing to suggest that the PSA ought to be modified.

For the same reason that the parties' PSA should be applied and enforced absent some substantial change in circumstances, we agree with the argument in Stephen's Point X that the trial judge's acceleration of Stephen's reimbursement of counsel fees incurred by Glenda in the domestic violence matter was mistaken because that ruling was inconsistent with the terms of the PSA. Glenda failed to demonstrate any colorable reason for modifying that to which the parties had agreed a short time earlier — that Stephen had one year from the entry of the divorce judgment to pay her $3825 in counsel fees. We, thus, reverse paragraph 29 of the November 28, 2012 order.

A-2083-12T1

And, lastly, we vacate paragraph 25 of the November 28, 2012 order by which the trial judge denied either party an award of counsel fees in connection with the motions that led to the November 28, 2012 order. Whether or to what extent fees may be awarded to either party should abide the trial judge's disposition of the parenting-time dispute engendered by Stephen's inability to enter Canada.

Affirmed in part; reversed in part; and vacated in part. The matter is remanded to the trial court for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2083-12T1